SLAWEK, Appellant, v. STROH and others, Respondents.

*No. 313.    Argued October 30, 1973.—Decided February 25, 1974.*
(Also reported in 215 N. W. 2d 9.)

300

For the appellant there was a brief by *Wheeler, Van Sickle, Day & Anderson* of Madison, and oral argument by *Norman C. Anderson.*

For the adult respondent Crysta Stroh there was a brief by *Tinkham, Smith, Bliss & Patterson* of Wausau, and oral argument by *Richard P. Tinkham.*

For the infant respondent Crysta Stroh there was a brief and oral argument by her guardian *ad litem Jerome P. Tlusty* of Schofield.

BEILFUSS, J. The issues presented both as to procedure and substantive law are quite complex. We turn first to the demurrer of the minor-defendant to the plaintiff-appellant's complaint "upon the grounds that the complaint does not state facts sufficient to constitute a cause of action for a declaratory judgment."

The complaint, as paraphrased in the plaintiff-appellant's brief, is as follows:

"It is alleged in the complaint that the appellant is a physician actively practicing his profession in the city of Philadelphia, Pennsylvania; that the appellant is presently married and resides with his wife and three children in the city of Philadelphia; that the appellant is the father of the infant respondent, Crysta Stroh, who was born out of wedlock at Camden, New Jersey, on or about December 29, 1971; that the mother of the infant respondent is the adult respondent, Crysta Stroh; that they reside together in the city of Medford, Taylor county, Wisconsin; that the appellant and the adult respondent, Crysta Stroh, are not now and never have been married to each other; that no judicial determination of the paternity of the infant respondent Crysta Stroh has ever been made; that appellant requested that the district attorney of Taylor county, Wisconsin, commence paternity proceedings pursuant to sec. 52.24, Wisconsin Statutes, but that said district attorney specifically declined to initiate such proceedings; that the adult respondent Crysta Stroh refuses to permit the appellant to have any contact or visitation with the infant respondent; that, on information and belief, the adult respondent Crysta Stroh is not able to support the infant respondent without assistance; that the appellant is financially responsible and capable of providing for the care, custody, support, and maintenance of the infant respondent and is a fit and proper person to have the care, custody, and control of the infant respondent; that

it is in the best interests of the infant respondent to have a determination of paternity and a determination of the rights and duties of appellant and of the adult respondent Crysta Stroh with respect to the child; that a declaratory judgment action is proper under the circumstances; and that the respondent Robert L. Brandner is made a party defendant pursuant to sec. 269.56 (11), Wisconsin Statutes, because of his official interest, as the district attorney of Taylor county, Wisconsin, in all paternity actions in Taylor county under Chapter 52, Wisconsin Statutes."

Two recent cases, among others, *Stanley v. Illinois* (1972), 405 U. S. 645, 92 Sup. Ct. 1208, 31 L. Ed. 2d 551, and *State ex rel. Lewis v. Lutheran Social Services* (1973), 59 Wis. 2d 1, 207 N. W. 2d 826,[2] in effect, recognized that fathers, including putative fathers, do have the right to establish they are a natural parent and, as such, have some parental rights and duties.

Admittedly, both *Stanley* and *Lewis* can be distinguished from this case upon their facts. In *Stanley*, the mother of three illegitimate children died and the state took custody of the children who were living with the father. An Illinois statute, which prohibited him from asserting parental rights and a right to custody, was held unconstitutional. *Lewis* was an adoption proceeding where the putative father was not given notice nor hearing prior to adoption.

In the second *Lewis Case*, in interpreting *Stanley*, we stated at pages 4 and 5:

". . . In *Stanley*, the supreme court decided two things: (1) That the denial of a natural father's paren-

[2] Our original opinion in *State ex rel. Lewis v. Lutheran Social Services* (1970), 47 Wis. 2d 420, 178 N. W. 2d 56, declaring the father of an illegitimate child did not have parental rights was reversed and remanded for reconsideration in light of *Stanley, supra,* and *Rothstein v. Lutheran Social Services* (1972), 405 U. S. 1051, 92 Sup. Ct. 1488, 31 L. Ed. 2d 786.

tal rights to a child born out of wedlock based on mere illegitimacy violated his constitutional right to equal protection of the laws, and (2) that the termination of a natural father's parental rights to a child born out of wedlock without actual notice to him, if he was known, or constructive notice, if unknown, and without giving him the right to be heard on the termination of his rights denied him due process of law."

In this case, therefore, we conclude that the plaintiff-appellant, as a putative father of an illegitimate child, does have the constitutional right to establish, if he can, his natural parentage, to assert parental rights, and a legal forum with due process procedures to establish these rights.

In Wisconsin, the only specific statutory procedure for establishing the parentage of illegitimate children and making provision for their care, custody and maintenance appears in ch. 52, Stats. The chapter deals with the broad problem of the support of dependents and is so titled. Sec. 52.21, and those sections immediately following, provide for the procedures in paternity proceedings. These sections do not contemplate nor provide for procedures for the commencement of a paternity action by the putative father. The action is to be commenced by the complaint of the mother [3] or by the district attorney if he believes the child is or is likely to become a public charge and believes it is in the best interests of the child to do so.

In this case the mother has not and probably will not make a complaint under the paternity statutory provisions. The complaint here alleges that the district attorney has been requested to commence a paternity action under the statute but that he declines to do so. The plaintiff-appellant commenced this action for declaratory relief under sec. 269.56, Stats., and prays for a judgment which declares he is the father of the minor child in

[3] Secs. 52.22, 52.25, Stats.

question and for a determination of his rights and duties as to the care, custody, maintenance and visitation of the minor child.

The guardian *ad litem* of the minor child, by demurrer, asserts that the facts alleged in the complaint do not entitle the plaintiff-appellant to declaratory relief primarily because the judgment if rendered, it is argued, will not terminate the controversy.

It has been suggested that a proper procedure is by way of a writ of mandamus to require the district attorney to commence a paternity action. Mandamus does not lie to compel a discretionary act. *Cartwright v. Sharpe* (1968), 40 Wis. 2d 494, 162 N. W. 2d 5. It is apparent from a consideration of all the issues raised in this case that it is primarily a dispute and conflict between the putative father and the mother as to questions of custody and visitation of the minor child. The duty of the district attorney is to prevent the minor child from being or becoming dependent upon the public for its care, support and maintenance. The pleadings here do not compel a belief that there has been a violation or refusal to perform a clear duty on the part of the district attorney so as to warrant a writ of mandamus.

At oral argument, a remedy by way of a writ of habeas corpus was also discussed. Habeas corpus can be utilized to determine questions of right to custody of a minor child,[4] but habeas corpus proceedings, too, are not well-designed for continued jurisdiction to meet the changing circumstances in questions of custody, visitation and care of a minor child.

Because the rights asserted by the plaintiff-appellant are of the kind that are constitutionally recognized, some procedures and some forum must be provided for him to assert and litigate these rights.

[4] 39 C. J. S., *Habeas Corpus*, p. 568, sec. 41.

The Declaratory Judgments Act, sec. 269.56 (1), Stats., provides that courts of record have this ". . . power to declare rights, status and other legal relations whether or not further relief is or could be claimed. . . ." Under this broad language certainly the question of whether the plaintiff-appellant is the natural father of the minor child could be determined.[5]

This court has on many occasions stated requisites for a declaratory judgment. They are: (1) A justiciable controversy must exist, (2) it must be ripe for determination, (3) it must be between persons whose interests are adverse, and (4) it must involve a legally protectible interest in the plaintiff.[6] From our examination of the facts as set forth in the complaint we believe all four of these conditions exist.

A common ground for refusing to hear a declaratory judgment action is that the judgment will not terminate the controversy. *American Medical Services, Inc. v. Mutual Federal Savings & Loan Asso., supra.* A declaratory judgment here will terminate the controversy as to whether the plaintiff-appellant is the natural father of the minor. It can also declare the rights as to custody, visitation, care and maintenance as the facts appear at the time of the hearing. It will terminate the controversy as the facts exist at that time and this determination will be final unless there is a subsequent change of the facts and circumstances.

Obviously, we are well aware that the facts and circumstances frequently do change in custody cases and that questions of care, custody and visitation are subject to continuing jurisdiction. In this aspect the controversy is not necessarily terminated. However, the Declaratory

---

[5] 26 C. J. S., *Declaratory Judgments*, p. 115, sec. 37.

[6] *American Medical Services, Inc. v. Mutual Federal Savings & Loan Asso.* (1971), 52 Wis. 2d 198, 203, 188 N. W. 2d 529, and cases cited therein.

Judgments Act provides in sec. 269.56 (8), Stats.,[7] that: "Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. . . ."

While declaratory relief in custody matters may be somewhat cumbersome insofar as continuing jurisdiction is concerned, the statutory authority given to the court is adequate and we believe is probably the best remedy available under existing statutory procedures.

Sec. 269.56 (6), Stats., provides that the court in the exercise of its discretion can refuse to grant a declaratory judgment where the judgment will not terminate the uncertainty or the controversy. We have discussed above the question of termination of the controversy. In any event, the trial court did not sustain the demurrer to the complaint upon an exercise of discretion on this ground. The demurrer was sustained and the complaint dismissed because the trial court was of the opinion that it appeared from the complaint that the plaintiff came into a court of equity with "unclean hands" and asked for affirmative equitable relief, and that under ancient rule he should not be afforded relief because of his own wrongdoing.

The "clean-hands" maxim should be applied with some restraint.[8] The adulterous conduct of the plaintiff-appellant may well be relevant evidence in other phases of this litigation, but in view of the recognition of the constitutionally protected rights of a parent as set forth in *Stanley* and *Lewis, supra,* the maxim cannot be invoked

---

[7] "SUPPLEMENTAL RELIEF. Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith."

[8] *Jewell v. United Fire & Casualty Co.* (1964), 25 Wis. 2d 509, 131 N. W. 2d 276.

to prevent the plaintiff from trying to establish those rights.

It is our opinion that the trial court was in error in sustaining the demurrer to the complaint and in entering judgment dismissing the complaint. The order and judgment are reversed and the matter remanded for trial with the right of the guardian *ad litem* to serve and file an answer within twenty days after remittitur.

Upon remand it would seem, on proper motion, that the trial court could grant judgment on the pleadings as to that phase of the action which requests a determination of parentage. The plaintiff-appellant has alleged he is the natural father of the minor child, the mother, by her answer, has admitted he is, and the minor, by her guardian *ad litem* in her counterclaim, has alleged he is.

The plaintiff-appellant has demurred to the affirmative defense set forth in the answer by the defendant-mother upon the ground the facts stated in the answer do not constitute a defense.

The affirmative defense, in substance, alleges that the minor-defendant is not and is not likely to become a public charge, that the mother is employed, in good health, well-educated and capable of caring for herself and the child. Proof of these allegations is very material and relevant to the standard the court must apply, namely, the best interests of the child, and must be considered by the court together with the other evidence. While proof of these allegations does not necessarily bar any right of the plaintiff, they are important and well-pleaded.

The demurrer to the affirmative defense was properly overruled and the order should be affirmed.

The first counterclaim of the defendant-mother alleges facts and relationships which sound in (1) fraud, deceit and misrepresentation, (2) breach of promise, (3) seduction, and (4) assault and battery. No motion has been made to separate the causes of action, to make more

definite and certain, nor to strike any parts thereof. The plaintiff-appellant's demurrer is basically upon two grounds: (1) That the counterclaim does not state facts sufficient to constitute a counterclaim, and (2) the counterclaim is barred upon the one-year statute of limitations (sec. 893.22 (2)) in actions for seduction.[9]

The allegations of the defendant-mother's first counterclaim are in substance as follows: During the first three months of their association plaintiff-appellant told her he was not married, loved her, wanted to marry her and wanted to visit her parents in Marinette, Wisconsin, to discuss marriage. She believed his statements and because of this had sexual relations with him. By accident she found out he was married, living with his wife and had three children. The plaintiff then told her he was not in love with his wife, that they had separated and divorce was being instituted, and that as soon as he was divorced he would marry her. All of these statements were false and made for the purpose of inducing her to have sexual relations with him. As a result of these relations a son was born in 1969 and has been adopted by third persons. She again became pregnant in 1970, and in August of 1970 suffered a miscarriage "by reason of manipulations and injections given to this defendant by the plaintiff upon false representations that they would not harm the unborn baby when, in fact and truth, they were the direct cause of and induced said miscarriage and abortion." The minor child in this action was born because of the false representations which led to the relationship between them. She also alleges that all the plaintiff's representations to her were false and fraudulent and that he has not and never intended to separate

---

[9] A third ground is set forth in the demurrer in connection with the assertion of no cause of action to the effect that the defendant-mother has no legal capacity to maintain the same because she was a party to the acts alleged. This ground has not been pursued or argued.

from his wife, and that these representations were made for the purpose of seducing her. She has had two illegitimate children and a miscarriage and abortion, and suffered an assault and battery solely because of his false representations, and suffered pain, both mental and physical, and has been held up to public ridicule and shame. The sexual relations took place in Pennsylvania and New Jersy and she has lived with her parents in Wisconsin since the birth of the minor child in this action.

The alleged causes of action based upon fraud resulting in breach of promise, seduction and assault and battery are not stated separately and the facts are commingled. However, in the absence of a proper motion, if any cause of action is stated the demurrer must be overruled. Further, under the familiar rule the complaint must be liberally construed in favor of the pleader to determine if any cause of action is stated.

The trial court properly recognized that actions for breach of promise to marry have been abolished in Wisconsin by secs. 248.01 and 248.02, Stats.[10] Therefore, no award of damages for breach of contract to marry can be made or sustained.

A cause of action for seduction has not been abolished and in the absence of a statute defining it, as is the case in Wisconsin, we must look to the common law. Seduction is: "The act of seducing. Act of man enticing woman to have unlawful intercourse with him by means of persuasion, solicitation, promises, bribes, or other means without employment of force."[11] A cause of action for breach of promise to marry need not be predicated upon

---

[10] Insofar as any conflicts of law problem is involved, both New Jersey (Title 2A:23–1 and 2 of New Jersey's Statutes Annotated) and Pennsylvania (Title 48, ch. 4, sec. 171 of Purdon's Penna. Statutes Annotated) have abolished causes of action for breach of contract to marry.

[11] Black's, *Law Dictionary* (4th ed.), p. 1523.

unlawful sexual intercourse; a cause of action for seduction must be—therein lies one of the significant differences.[12]

At common law, actions for seduction were for damages for the loss of services based upon the relationship of master and servant. The one bringing the action must have been entitled to and have lost the services of the woman seduced. The legislature has not extended the right nor defined seduction so as to permit the seduced person to assert a cause of action on her own behalf.

The Wisconsin Constitution, art. I, sec. 9, provides in part:

"Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; . . ."

Seduction is a common law and not a statutorily controlled action in Wisconsin. To extend the right of recovery to the woman seduced does not create a new cause of action insofar as the seducer is concerned—his conduct is reprehensible and he should respond in damages whether it be to parent or the woman herself. This is especially true at this stage of our social development when it is no longer realistic to think of the services and wages of a woman belonging to her husband or parents with the same inflexibility as we did one hundred years ago.

A fear is that if a recovery for seduction is allowed it will thwart the purposes of the legislature in outlawing breach of promise actions. We think not. A breach of promise to marry is in the nature of a contract and seduction is definitely a tort. Further, if the right of a woman to recover damages for her own injury is limited to those cases where the seduction is induced by false or

[12] *Wendt v. Lentz* (1929), 197 Wis. 569, 222 N. W. 798; 79 C. J. S., *Seduction*, p. 956, sec. 3.

fraudulent representations, the danger of permitting recovery for breach of promise with the evils attendant in many breach of promise cases is eliminated. We therefore hold a woman may recover damages for her seduction where the act or acts of seduction are induced by false or fraudulent representations.[13] Her burden of proof as to the fraud or fraudulent representation is by evidence that is clear and convincing. If this right of recovery is to be further expanded it will have to await subsequent cases or legislative action. We conclude, therefore, the defendant-mother does state a cause of action for seduction in her first counterclaim.

Two hurdles remain, however, before the order overruling the demurrer can be affirmed—conflict of laws—and statute of limitations.

From the allegations in the counterclaim, the acts of seduction occurred in Pennsylvania and New Jersey. Does the law of the forum state, Wisconsin, or the law of the state where the acts took place apply?

New Jersey, by legislative action, abolished the action to recover money damages for seduction in 1935 (see Title 2A:23, New Jersey Stats. Anno.). Pennsylvania has no statutory right to recover for seduction and the common law does not allow her to recover.

". . . She is a partaker of the crime, and cannot come into court to obtain satisfaction for a supposed injury to which she was consenting.

". . .

". . . A woman is not seduced against her consent, however basely it be obtained; and the maxim *volenti non fit injuria* is applicable to her as to a husband, whose consent to his own dishonor bars his action for criminal conversation. . . ." *Oleszefski v. Taylor* (Pa. 1907), 19 Dist. Rep. 145, 147.

In *Wilcox v. Wilcox* (1965), 26 Wis. 2d 617, 633–635, 133 N. W. 2d 408, this court rejected the *lex loci* rule in

[13] 43 Marquette Law Rev. (1959–1960), 341, 356.

conflicts of law or choice of law problems and adopted the grouping of significant contacts. We said there, at page 634:

". . . We start with the premise that if the forum state is concerned it will not favor the application of a rule of law repugnant of its own policies, and that the law of the forum should presumptively apply unless it becomes clear the nonforum contacts are of the greater significance. . . ."

In this case, the law of New Jersey and Pennsylvania is repugnant to our rule of law as just announced. The plaintiff started his action here, the defendant-mother lives here and, although of lesser significance, the minor-defendant lives here. Wisconsin has a primary interest in the welfare of its citizens. The plaintiff is a resident of Pennsylvania and a recovery against him does not offend the law of New Jersey, nor does the fact that a recovery against him might offend the law of Pennsylvania outweigh the interests that Wisconsin has. We conclude the principal contacts and the interests of Wisconsin are centered here and the law of Wisconsin is the better choice and applies.

Having determined the Wisconsin law is the better choice, the Wisconsin statute of limitations applies. The plaintiff contends sec. 893.22 (2), Stats., which provides that an action for seduction must be commenced within one year after the cause of action has accrued prevents a recovery. The plaintiff further contends the statute began to run from the time of the first act of seduction. We believe the better rule is that the cause of action accrues and the statute begins to run from the last act of seduction because it was, as alleged, a consistent and continuous course of conduct on the part of the plaintiff. The defendant alleges these acts of seduction continued until December 29, 1971. The counterclaim was served on May 19, 1972, well within the one-year period. In any event,

causes of action based upon fraud or deceit have a six-year statute of limitations, sec. 893.19 (5), and assault and battery two years, sec. 893.21 (2).

The plaintiff-appellant also contends the cause of action for assault and battery for the miscarriage must fail because the defendant-mother does not allege an intention to injure and that she consented to the acts.

The defendant-mother alleged the plaintiff was and is a doctor and falsely represented to her that the manipulations and injections which he gave her would not harm the child she was carrying and that she believed and relied upon these false representations and that a miscarriage occurred. Fraud vitiates consent. From the allegations of the complaint it can readily be inferred that the plaintiff-doctor knew that the injections and the manipulations would cause a miscarriage and that he so intended. The demurrer to the first counterclaim was properly overruled.

The second counterclaim of the defendant-mother alleges in substance that the plaintiff-appellant, by his intentional physical acts in repeatedly telephoning her and her family at all hours of the day and night, interrupting their sleep and other activities, that by wild and false ruses, stories and use of false names, he has repeatedly tried to see her and associate with her despite her repeated refusal to talk with him or see him, that by these actions he invaded her privacy in her home and in public and private and before her parents and friends, and that these acts caused her great mental anguish, suffering and humiliation and that she has been held up to ridicule, shame, contempt and embarrassment in public and private and before other persons.

The plaintiff contends that in Wisconsin a cause of action for invasion of privacy is not recognized and cites *Judevine v. Benzies-Montanye Fuel & Warehouse Co.* (1936), 222 Wis. 512, 269 N. W. 295, and *Yoeckel v. Samonig* (1956), 272 Wis. 430, 75 N. W. 2d 925.

As a generalization, Wisconsin does not recognize a cause of action for invasion of privacy; however, an exception was recognized in *Alsteen v. Gehl* (1963), 21 Wis. 2d 349, 124 N. W. 2d 312, where we stated at pages 356, 357:

"We now conclude that a person may recover damages for severe emotional stress alone, if such psychological condition is the result of the extreme and outrageous conduct of another and if such course of conduct was undertaken by the defendant for the purpose of inflicting psychological harm upon the injured person."

The court then elaborated on the requirements for recovery, saying at pages 359–361:

". . . Four factors must be established for an injured plaintiff to recover:

"(1) The plaintiff must show that the defendant's conduct was intentional; that is to say, the defendant behaved as he did for the purpose of causing emotional distress for the plaintiff.

"(2) In addition to being intentional, the defendant's conduct must be extreme and outrageous. The average member of the community must regard the defendant's conduct in relation to the plaintiff, as being a complete denial of the plaintiff's dignity as a person. The requirement that the conduct be extreme and outrageous reflects our concern with the difficulties surrounding proof of the existence of severe emotional harm, and proof of a causal relationship between the injury and the defendant's conduct. If the conduct is gross and extreme it is more probable that the plaintiff did, in fact, suffer the emotional distress alleged. Moreover, the requirement of extreme and outrageous conduct as a condition of recovery will avoid litigation 'in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law.'

"(3) The plaintiff must demonstrate that the defendant's conduct was a cause-in-fact of his injury. The mere fact that a person may have had some pre-existing susceptibility to emotional distress does not necessarily preclude liability. A person who bullies another who is emotionally vulnerable shall be deemed liable for intensifying

a pre-existing condition of psychological stress. However, a defendant will have the opportunity to demonstrate that the plaintiff's disabling emotional condition would have been present even in the absence of the defendant's intervening conduct. If the defendant should successfully make this demonstration, he would establish that this conduct was not a cause-in-fact of the injury, hence there would be no liability.

"(4) The plaintiff must demonstrate that he suffered an extreme disabling emotional response to the defendant's conduct. The severity of the injury is not only relevant to the *amount* of recovery, but is a necessary element to *any* recovery. The plaintiff must demonstrate that he was unable to function in his other relationships because of the emotional distress caused by defendant's conduct. Temporary discomfort cannot be the basis of recovery."

We believe the facts alleged by the defendant-mother are sufficient to constitute a cause of action as described in *Alsteen* and that the trial court properly overruled the demurrer to the second counterclaim.

The infant minor, by her guardian *ad litem,* by way of counterclaim, has alleged a cause of action which can be referred to as "wrongful birth" or "wrongful life" for lack of a better description.

He alleges, in the minor's behalf, that the plaintiff-appellant is her father and induced her mother to have sexual relations upon the fraudulent promise that he would marry her, knowing his promise was false because he was already married and was married at the time of her birth, that the plaintiff-appellant knew or should have known that his acts would cause the birth of a child and cause such child mental pain and anguish, and that because she was born an adulterine bastard she does suffer mental pain and anguish and is subject to public humiliation and embarrassment.

As far as our research has permitted, we have been unable to find that a cause of action for wrongful birth has ever been recognized.

In *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, 190 N. E. 2d 849, the Illinois Court of Appeals considered a complaint that is almost identical to the facts alleged here. The court there recognized a tort may have been committed but affirmed an order sustaining the demurrer upon what might be called "public policy grounds."

The court stated at pages 259, 260 and 262:

"Recognition of the plaintiff's claim means creation of a new tort: a cause of action for wrongful life. The legal implications of such a tort are vast, the social impact could be staggering. If the new litigation were confined just to illegitimates it would be formidable. In 1960 there were 224,330 illegitimate births in the United States, 14,262 in Illinois and 10,182 in Chicago. Vital Statistics of the United States 1960, Vol. 1, secs. 1, 2 (1962). . . .

"It is not the suits of illegitimates which give us concern, great in numbers as these may be. What does disturb us is the nature of the new action and the related suits which would be encouraged. Encouragement would extend to all others born into the world under conditions they might regard as adverse. One might seek damages for being born of a certain color, another because of race; one for being born with a hereditary disease, another for inheriting unfortunate family characteristics; one for being born into a large and destitute family, another because a parent has an unsavory reputation.

". . .

"We have decided to affirm the dismissal of the complaint. We do this, despite our designation of the wrong committed herein as a tort, because of our belief that lawmaking, while inherent in the judicial process, should not be indulged in where the result could be as sweeping as here. The interest of society is so involved, the action needed to redress the tort could be so far-reaching, that the policy of the State should be declared by the representatives of the people."

While this court is probably not powerless to recognize this tort as a valid cause of action by virtue of art. I, sec. 9 of the Wisconsin Constitution (set forth above), we believe, as the Illinois court did, that the creation and recognition of a cause of action for wrongful birth would

have vast social ramifications and the creation of such a cause of action is the type of public policy decision that should be made by the people of this state or their elected legislative representatives. The plaintiff-appellant's demurrer to the minor-defendant's first counterclaim should be sustained.

A final comment is in order. When this case is remanded and the necessary proceedings are completed so that the case is ready for trial, we believe the trial court should order separate trials pursuant to secs. 270.07 and 270.08, Stats. On the issues of visitation, support and maintenance, the parties are not entitled to a jury trial. The guardian *ad litem*, however, should appear to represent and protect the interests of the minor child. The parties are entitled to a jury trial as to the issues raised by the counterclaims of the defendant-mother and it should be afforded to them unless waived.

*By the Court.*—The order sustaining the minor-defendant's demurrer to the complaint and the judgment dismissing the complaint are reversed; the order overruling the plaintiff's demurrer to the adult defendant's affirmative defense is affirmed; the order overruling the plaintiff's demurrer to the adult-defendant's first and second counterclaims is affirmed; the order overruling the plaintiff's demurrer to minor-defendant's first counterclaim is reversed; judgment should be entered dismissing the minor's counterclaims; and the case is remanded for further proceedings. No costs to be taxed.

HALLOWS, C. J. *(concurring).* The trip referred to in the dissent has been even longer along the mainline than stated. This court in the first *Lewis Case* [1] in which this author dissented held to the traditional view that a father

[1] *State ex rel. Lewis v. Lutheran Social Services* (1970), 47 Wis. 2d 420, 178 N. W. 2d 56.

of a child born out of wedlock had no natural parental rights. That trip was down a sidetrack because *Stanley* [2] took the position of the dissent and sent *Lewis* back for reconsideration. The court then had to reverse itself and then in the second *Lewis Case* [3] under the mandate of *Stanley* recognized the natural rights of a father to a child born out of wedlock and undertook to provide a due process procedure for putative fathers to establish those rights. This case goes no further than *Lewis.*

No amount of discussion can dilute the holding of *Stanley.* While it might be hard for some people to accept, its holding cannot be eroded by constant criticism.

A decision is to be interpreted in the light of facts which form its background. I can see no implication in this case or in *Lewis* why a rapist should have rights as a natural father. In *Lewis, Stanley,* and in this case there was consent to the intercourse. The parties were willing to become parents or at least take the chance—not so in a rape. When a rape issue is presented to this court, it will be appropriate for this court to then decide the case, and not now intimate what it is going to hold. I reject both the trip and the flavor of the dissent.

ROBERT W. HANSEN, J. *(dissenting).* From its interpretation of *Stanley* [1] to its holding in *Lewis* [2] the majority here travels further to hold that ". . . a putative father of an illegitimate child, does have the constitutional right to establish, if he can, his natural parent-

[2] *Stanley v. Illinois* (1972), 405 U. S. 645, 92 Sup. Ct. 1208, 31 L. Ed. 2d 551.

[3] *State ex rel. Lewis v. Lutheran Social Services* (1973), 59 Wis. 2d 1, 207 N. W. 2d 826.

[1] *Stanley v. Illinois* (1972), 405 U. S. 645, 92 Sup. Ct. 1208, 31 L. Ed. 2d 551.

[2] *State ex rel. Lewis v. Lutheran Social Services* (1973), 59 Wis. 2d 1, 207 N. W. 2d 826.

age, to assert parental rights, and a legal forum with due process procedures to establish these rights." Under this unconditional holding, it is difficult to see why a rapist would not be entitled to a declaratory judgment enforcing his rights as the natural father of a child born to the victim of the rape as a result of the rape. In any event, from *Stanley* to *Lewis* to *Slawek* has been quite a trip.

In *Stanley,* where a mother had died and the state sought to take the three children from the custody of their father on the "single fact that he and the dead mother had not been married," the United States Supreme Court set aside the state's action, holding that fathers of children born out of wedlock are entitled to ". . . a hearing on their fitness before their children are *removed from their custody.* . . ." [3] (Emphasis supplied.) In *Stanley,* the high court began its opinion by noting that "Joan Stanley lived with Peter Stanley intermittently for 18 years, during which time they had three children. When Joan Stanley died, Peter Stanley lost not only her but also his children. . . ." [4]

In *Lewis,*[5] where the father of a child born out of wedlock sought to set aside both termination of parental rights proceedings and a completed adoption, this court, in a four-to-three decision, went beyond the facts and holding of *Stanley* [6] to hold that in this state a natural

---

[3] *Stanley v. Illinois, supra,* at pages 646, 647, 658.

[4] *Id.* at page 646.

[5] *State ex rel. Lewis v. Lutheran Social Services* (1973), 59 Wis. 2d 1, 207 N. W. 2d 826.

[6] *Id.* at pages 13–21, dissenting opinion, stating: ". . . In *Stanley,* the three children lived with their father and mother for eighteen years in what some states would recognize as an entirely legal common-law marriage. Their home was the only home the three children ever knew, and their father never denied the fact of his paternity and never refused to accept the responsibilities of his fatherhood.

"That cannot be said of the petitioner here. . . ."

father's parental rights could not be terminated ". . . without actual notice to him, if he was known, or constructive notice, if unknown, and without giving him the right to be heard . . . ." [7] While *Lewis* did not involve the removal of a child from a natural father having actual custody, both *Lewis* and *Stanley* dealt with protections given natural fathers of illegitimate children against state action changing custody or terminating rights. Neither *Stanley* nor *Lewis* go beyond the area of assuring notice and hearing before, as in *Stanley,* the child can be taken from the father or, as in the majority holding of *Lewis,* termination of parental rights of such father can be lawfully terminated. Neither *Stanley* nor *Lewis* deal with the right of a father, whose paternity of an illegitimate child is in fact not contested, to seek custody and visitation rights of the child he sired out of wedlock.

In *Slawek,* the case before us, the putative father of a child born out of wedlock seeks, via declaratory relief, what the majority opinion describes as ". . . a judgment which declares he is the father of the minor child in question and for a determination of his rights and duties as to the care, custody, maintenance and visitation of the minor child." The majority holds that the natural father of an illegitimate child has a constitutional right thus (1) "to establish, if he can, his natural parentage," and (2) "to assert parental rights," identified in the opinion as including "care, custody, maintenance and visitation of the minor child." Nowhere in the opinion is it even suggested that his right either to establish parentage or to assert parental privileges is subordinate to the rights of the child involved. Yet, in *Stanley,* even as to the limited right of a natural father to notice and hearing before children can be taken from his actual custody, the United States Supreme Court so limited the right in-

[7] *Id.* at pages 4, 5.

volved, holding: "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, *absent a powerful countervailing interest*, protection. . . ." [8] (Emphasis supplied.) The best interest of the child is such powerful countervailing interest. The rights of a natural father do not exist in a vacuum. They coexist, and are subordinate to the rights of the child involved. In this state, by statute, as to a natural father's claim to custody, a court "shall never give the custody of the child" to the natural father "unless the welfare of such child will be promoted thereby." [9]

The writer concludes that *Stanley*, by conditioning protection of the rights of a natural father upon the absence of "a powerful countervailing interest," strengthened the Wisconsin public policy of placing first and foremost concern for the welfare of the child involved in cases involving custody and parental rights. As to custody placement and related matters, our cases have so held. [10] As to paternity proceedings involving fathers of illegitimate children, our statutes so provide. [11] It is where the

[8] *Stanley v. Illinois, supra*, at page 651.

[9] Sec. 52.21, Stats., **Paternity proceedings, jurisdiction, orders,** providing: "(2) . . . provided that the court shall never give the custody of the child to the defendant [the natural father] unless the welfare of such child will be promoted thereby . . . ."

[10] *See: Welker v. Welker* (1964), 24 Wis. 2d 570, 578, 129 N. W. 2d 134, stating: ". . . the polestar remains the welfare of the child. . . ." *See also: Wendland v. Wendland* (1965), 29 Wis. 2d 145, 157, 138 N. W. 2d 185, holding that children, in disputes as to their custody, ". . . are not to be buffeted around as mere chattels . . . but rather are to be treated as interested and affected parties whose welfare should be the prime concern of the court in its custody determination."

[11] Sec. 52.45, Stats.: **"Construction of sections 52.21 to 52.45.** Sections 52.21 to 52.45 [Note: the paternity proceedings statutes] shall be so interpreted and construed as to effectuate the protection and welfare of the child involved in any proceedings hereunder. . . ."

protection and welfare of the child involved are served thereby that there is the need for a forum and a procedure to establish the fact of parentage and provisions for determination of parental rights and duties. It is primarily on behalf of the child that there is need to establish paternity, provide for maintenance and support by the father and determine custody and visitation disputes.

The writer finds the paternity proceedings statutes (secs. 52.21 to 52.45, Stats.) to be appropriate and available for the judicial determination of parentage and parental rights as to children born out of wedlock. The majority views these statutory provisions as available only (1) where the mother of the illegitimate child initiates the action; [12] and (2) where the child born out of wedlock is likely to be a public charge. [13] However, it is also provided that ". . . all such proceedings shall be commenced in the name of the state on the relation of the complainant, or on relation of the child if the complainant is dead, or insane, or does not prosecute. . . ." [14] A first, quick reading of this provision for commencing proceedings on behalf of the child might suggest the literalistic construction that "complainant," as here used, means one who signs a complaint. But three absurd results flow from such interpretation: (1) Only if the mother died after signing the complaint could an action be started on behalf of the child for maintenance; (2) only if the mother became insane after signing the complaint could paternity of the natural child of an insane mother be established; and (3) the "does not prosecute" reference would be no more than a restatement of another specific statutory provision, to wit, sec. 52.23, Stats. The writer would read "complainant" as referring to the

[12] Sec. 52.22, Stats.
[13] Sec. 52.24, Stats.
[14] Sec. 52.45, Stats.

mother of the child born out of wedlock, rather than only a mother who signs a complaint. The construction of the statute directing initiating proceedings on behalf of the mother who is dead, insane or who fails to prosecute is supported by the preceding sentence in the same section, providing: "Sections 52.21 to 52.45 shall be so interpreted and construed as to effectuate the protection and welfare of the child involved in any proceedings hereunder."

In the case before us, the putative father of the child born out of wedlock initially requested the district attorney to commence paternity proceedings with the putative father named as defendant. The district attorney declined to do so. Unless he had reason to believe that instituting such interests would not be in the best interests of the minor child, the writer would hold that the district attorney had a clear duty to commence such proceedings where the mother failed to prosecute, exactly as he would have if the mother had died in childbirth or had been adjudged insane. Generally speaking, prosecutorial discretion "approaches the quasi-judicial." [15] However, here the district attorney is statutorily directed to commence paternity proceedings on behalf of the child where its mother elects not to prosecute. The authority conferred is subject to the legislative direction that accompanies it. The statutory mandate is to "effectuate the protection and welfare of the child involved." [16] The prescribed prosecutorial duty, deriving from both mandate and authority, is for the district attorney to institute paternity proceedings on behalf of the child, in the

---

[15] *State ex rel. Kurkierewicz v. Cannon* (1969), 42 Wis. 2d 368, 378, 166 N. W. 2d 255. Citing and quoting at pages 379, 380, *State v. Coubal* (1946), 248 Wis. 247, 21 N. W. 2d 381, at page 257, holding: ". . . There is, however, no basis for holding that his duties in representing the state are not subordinate to legislative direction as to the cases in which he shall proceed."

[16] Sec. 52.45, Stats.

name of the state, where the mother does not prosecute. Mandamus does lie to compel public officers to perform their prescribed statutory duties.[17] Where the district attorney refused to institute paternity proceedings at the putative father's request, the indicated recourse of such father was, by writ of mandamus, to insist upon the performance of the duty prescribed by statute.

While a comparison between alternative ways of proceeding to establish parentage and assert parental rights ought not be required, with proceeding under sec. 52.45, Stats., found adequate and available, the writer would add that he considers declaratory relief neither appropriate nor available here. Declaratory relief in this state is granted only where granting such relief will terminate the controversy.[18] As to the matters of care, custody,

[17] *State ex rel. Kurkierewicz v. Cannon, supra,* at pages 379, 380, holding: "The district attorney's function, in general, is of a discretionary type, the performance of which is not compellable in mandamus. . . .

"Yet, where the legislature has spoken and directed the performance of duties under particular facts, the district attorney is obligated to comply with the legislative mandate. . . .

"While it is thus apparent that the district attorney is invested with great discretion and in the usual case can manage his office free from the overseership of the courts or the legislature, it is equally clear that the legislature may, if it desires, spell out the limits of the district attorney's discretion and can define the situations that will compel him to act in the performance of his legislatively prescribed duties."

[18] *Pension Management, Inc. v. DuRose* (1973), 58 Wis. 2d 122, 132, 205 N. W. 2d 553, stating: "The final question on this appeal is whether or not a declaratory judgment in this action would terminate the controversy. Sec. 269.56 (6), Stats., grants a trial court discretion to deny an application for declaratory relief 'where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy. . . .' " Citing and quoting *Outagamie County v. Smith* (1968), 38 Wis. 2d 24, 37, 155 N. W. 2d 639, stating: "22 Am. Jur. 2d, *Declaratory Judgments*, p. 852, sec. 13, points out that a declaration of rights 'should not be rendered if it will not finally settle an actual controversy . . . .'

maintenance and visitation, it is impossible to hold that a declaratory judgment will finally determine the controversy. Court orders for care, custody, maintenance and visitation privileges are inherently interim in nature, subject to modification and revision in view of changed circumstances of the parents or changed needs of the child. This court rejects declaratory relief where granting a declaratory judgment predictably could only result in requests for supplementary remedies.[19] The majority opinion rejects habeas corpus, often utilized to resolve questions of right to custody of a minor child,[20] because ". . . habeas corpus proceedings, too, are not well-designed for continued jurisdiction to meet the changing circumstances in questions of custody, visitation and care of a minor child." Declaratory judgments are neither well-designed, nor up to now, have they been made available as to controversies they cannot with finality terminate.[21]

The writer would affirm the action of the trial court in sustaining the demurrer of the minor-defendant, entered

The same paragraph (p. 853) also points out that there is authority to a stronger effect and that is 'that a court may not grant declaratory relief unless it is convinced that its judgment will end the litigation and fix the rights of the parties.' "

[19] *Outagamie County v. Smith, supra*, at page 38: "We conclude that any declaration of rights that might result from the defendants' complaint for declaratory judgment could only result in a request for supplementary remedies which this court would refuse to grant. Accordingly, a declaration of rights against either the state administrative bodies concerned or the individuals could not have the effect of terminating the controversy. . . ."

[20] *See:* 39 C. J. S., *Habeas Corpus*, p. 568, sec. 41.

[21] *American Medical Services, Inc. v. Mutual Federal Savings & Loan Asso.* (1971), 52 Wis. 2d 198, 204, 188 N. W. 2d 529, holding: ". . . We think the declaratory judgment action cannot be used on the facts presented.

"In this case a declaration of plaintiff's rights would not terminate the controversy. . . ."

by the child's guardian *ad litem,* and would affirm the trial court judgment dismissing the complaint of the plaintiff.

I am authorized to state that Mr. Justice LEO B. HANLEY joins in this dissent.