DUMER, by Guardian *ad litem,* and others, Appellants, v. ST. MICHAEL'S HOSPITAL and others, Respondents.

*No. 57 (1974). Argued September 3, 1975.—Decided September 30, 1975.*
(Also reported in 233 N. W. 2d 372.)

For the appellants there was a brief by *Gerald J. Bloch* and *Phillips, Hoffman & Bloch,* all of Milwaukee, and oral argument by *Gerald J. Bloch.*

For the respondent St. Michael's Hospital there was a brief by *Kluwin, Dunphy, Hankin & McNulty,* attorneys, and *Michael J. Pfau* of counsel, all of Milwaukee, and oral argument by *Mr. Pfau;* for the respondents Physicians Emergency Service Corporation, Eleanor Regan, personal representative of the estate of Joseph Regan, M.D., and St. Paul Mercury Insurance Company, there was a brief by *Arnold, Murray & O'Neill,* attorneys, and *Robert C. Watson* of counsel, all of Milwaukee, and oral argument by *Mr. Watson.*

BEILFUSS, J. The amended complaint attempts to set forth two causes of action. The first one is by the guardian *ad litem* on behalf of the infant minor Tanya for wrongful life caused by rubella (German measles) suffered by her mother during the first trimester of her mother's pregnancy. The infant Tanya was born with deformities, mental retardation and anomalies because her mother had rubella during pregnancy. The second cause of action is by the parents, Ritchie Dumer

and Carol Dumer, for recovery of past and future medical hospital and supportive treatment expenses because of Tanya's condition.

The allegations of the complaint are in substance as follows:

On March 18, 1972, plaintiff-appellant Carol Dumer sought treatment for an upper body rash in the emergency room of defendant-respondent St. Michael's Hospital. She advised the attending nurses she thought her condition was rubella and repeated that suggestion to defendants' decedent, Joseph Regan, M.D., an employee of defendant-Physicians Emergency Service Corporation. He negligently diagnosed Carol Dumer's condition as an allergic reaction and discharged her. At this time, Carol Dumer had been pregnant for about one month. It is not alleged that she told either the nurses or the doctor that she was pregnant, nor that she knew she was.

On November 19, 1972, plaintiff-appellant Tanya Dumer was born with a "rubella syndrome;" she suffers permanent physical and mental retardation, cataracts, and heart malfunctions.

The plaintiffs allege that as a result of the negligent diagnosis by the defendants and their failure to advise Carol Dumer of the possible effects of rubella on the fetus and of the possibility of abortion, Tanya Dumer was not aborted, to her personal injury and to the financial injury to her parents. This is apparently an allegation that an abortion would, in fact, have been sought.

The complaint alleges that both the hospital and the doctor were negligent in the following respects:

"A. Failing to diagnose the presence of German measles in Carol Dumer;

"B. Failing to make reasonable inquiry as to the possibility of the presence of German measles in Carol Dumer; or as to whether she was pregnant;

"C. Failing to take tests to determine the presence of German measles in Carol Dumer despite the presence of clinical and epidemiologic symptoms;

"D. Failing to advise Carol Dumer of the effect that German measles would have on the unborn child and failing to advise her of the therapeutic availability of an abortion."

We will first consider the cause of action against St. Michael's Hospital. The plaintiff Carol Dumer presented herself as a patient at the emergency room of the hospital. Mrs. Dumer complained of the upper body rash and stated she thought she might have German measles. She was interviewed by the nurses who then called Dr. Regan. The allegations of negligence, all in the form of nonfeasance, are that the hospital personnel failed to diagnose the condition as rubella, failed to inquire as to pregnancy, failed to perform clinical tests, and failed to advise of the effects of rubella upon an unborn child and advise of the availability of abortion.

Under these factual allegations, we conclude the hospital did not breach a duty owed to Carol Dumer. Hospital employees, either nurses or attendants, are not legally competent nor legally required to make a medical diagnosis[1] without direction and supervision of a licensed physician. The hospital employees, under the circumstances alleged here, exercised ordinary care and thus performed the duty owed to the patient—they admitted the patient and called a doctor.[2] There is no allegation the hospital in any way failed to carry out the doctor's orders or directions or failed to assist him in any manner. Nurses and attendants, under these

[1] See: Secs. 448.02 (1) and 445.01 (1) (a), Stats.

[2] Although not directly in point, the following cases do consider the duty of hospital employees: *Schuster v. St. Vincent Hospital* (1969), 45 Wis. 2d 135, 172 N. W. 2d 421; *Cramer v. Theda Clark Memorial Hospital* (1969), 45 Wis. 2d 147, 172 N. W. 2d 427; and *Wills v. Regan* (1973), 58 Wis. 2d 328, 206 N. W. 2d 398.

facts, are not required to make a temporary diagnosis nor advise the patient as to a course of treatment. The hospital did not breach any duty owed to Carol Dumer nor the infant-plaintiff Tanya. The trial court correctly sustained the demurrer and ordered judgment dismissing the complaint as to the defendant St. Michael's Hospital.

In the first cause of action the plaintff Tanya, through her guardian *ad litem*, alleges that as a result of the negligence of the defendants she was "not aborted" and "was allowed to be born to a wrongful life; that she was born disabled, retarded and crippled; and that her ability to enjoy life has been permanently impaired."

There is no assertion that the alleged negligence of the defendants caused the congenital defects of the plaintiff Tanya. The defects were caused by the rubella her mother contracted during the first trimester of the pregnancy. The mother had rubella before she came to the hospital or saw the doctor and its effects upon the unborn child were irreversible. There is nothing the defendants did or could have done to alter the effects of rubella upon the unborn child. The claim is that if the doctor would have properly diagnosed her mother's condition as rubella and informed her parents of the probabilities (or possibilities) of birth defects, they would have decided to have an abortion[3] which would have prevented her birth.

The effect of these allegations made by the child, through her guardian *ad litem*, is to claim that if defendants had not been negligent she would not have been born and that because she was born with con-

---

[3] The complaint uses the term "therapeutic abortion." A therapeutic abortion, as we understand it, generally means the termination of a pregnancy that was a serious threat to the health or life of the mother. Here there was no threat to the health or life of the mother. The abortion contemplated by the plaintiffs might better be described as a "eugenic abortion" intended to prevent the birth of a defective child.

genital defects the defendants are liable to her for damages.

This court has recently in *Slawek v. Stroh* (1974), 62 Wis. 2d 295, 215 N. W. 2d 9, refused to recognize as enforceable a cause of action for wrongful birth or wrongful life. In *Slawek,* the factual situation was quite different. In that case the infant-plaintiff was born a normal child. She was born illegitimate and sued her putative father for embarrassment, humiliation and lack of social standing she would endure. Here the infant was not born a normal child but a child with serious congenital defects. She sues not her parents but the doctor who examined and advised her mother. While public policy considerations set forth in *Slawek* are not based on the same type of facts as we are concerned with here, they do have some weight in the conclusion we reach.[4]

The major obstacle to the claim of the infant-plaintiff is a determination of damages. In *Gleitman v. Cosgrove* (1967), 49 N. J. 22, 227 Atl. 2d 689, the New Jersey court was faced with an analogous claim. There, as here, the minor plaintiff was born with birth defects due to rubella during her mother's pregnancy. They consulted the defendant doctor who advised the mother she was two months pregnant. She told the doctor she had recently had German measles; the doctor told her this would have no effect upon the child to be born. Both the minor child and the parents sued the doctor. There, too, the claim was made that because of the advice of the doctor the parents were denied the opportunity to terminate the life of the child in its embryonic state. Both causes of action were dismissed upon a motion for nonsuit.

[4] *Pinkney v. Pinkney* (Fla. 1967), 198 So. 2d 52; *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, 190 N. E. 2d 849; *Williams v. State* (1966), 18 N. Y. 2d 481, 223 N. E. 2d 343.

The majority opinion in *Gleitman, supra,* in considering the claim of the minor plaintiff, stated at page 28:

"The infant plaintiff is therefore required to say not that he should have been born without defects but that he should not have been born at all. In the language of tort law he says: but for the negligence of defendants, he would not have been born to suffer with an impaired body. In other words, he claims that the conduct of defendants prevented his mother from obtaining an abortion which would have terminated his existence, and that his very life is 'wrongful.'

"The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies."

We agree with the New Jersey court. The damages claimed cannot be measured by any standards recognized by our law.[5]

We conclude the complaint of the infant Tanya does not state a cause of action against the defendants. The trial court's order and judgment as to this cause of action must be affirmed.

The cause of action of the parents for damages for "extensive medical and hospital expenses because of treatment required by Tanya Dumer [and] that they will continue to incur additional extensive hospital, med-

---

[5] There is authority to the contrary. *See* the dissent in *Gleitman, supra,* and *Wrongful Life,* 55 Minn. L. Rev. (1970), 58.

ical and supportive expenses because of Tanya Dumer's condition" presents different considerations.

The congenital defects described in this case were not caused by negligent action or nonaction on the part of the defendant-doctor. The defects here were the result of the effects of rubella during pregnancy. There is no claim that at the time the plaintiff Carol Dumer presented herself for an examination there was anything the doctor could do to reverse or minimize the effects of rubella.

Recently in *Rieck v. Medical Protective Co.* (1974), 64 Wis. 2d 514, 219 N. W. 2d 242, the parents of an "unwanted child" sued an obstetrician for failing to diagnose the mother's pregnancy during its early stages and during the time she could obtain an abortion because of the unplanned or unwanted pregnancy. The child in the *Rieck Case* was born normal and healthy. The parents sued for the probable costs of raising the child during its dependency. Upon demurrer this court dismissed the complaint of the plaintiffs-parents.

We stated at pages 517–519:

". . . Recovery, or the determination to impose or not to impose liability, involves public policy considerations. Even where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden (in the case before us, upon physicians and obstetricians); or (5) because allowance of recovery would be too likely to open the way for fraudulent claims, or (6) allowance of recovery would enter a field that has no sensible or just stopping point. . . .
". . .
". . . We have no hesitancy in concluding that to hold that the allegations of this complaint constitute a cause

of action for recoverable damages would open the way for fraudulent claims and would enter a field that has no sensible or just stopping point."

*Rieck* must be distinguished from the case at hand because the parents there sought to recover the entire expense of raising a normal, healthy but claimed unwanted child during its dependency. Here the parents sue only for the expense occasioned by the congenital defects.

Assuming the factual allegations to be true as we must when considering a demurrer to a complaint, we conclude the defendant-doctor was negligent in not diagnosing the plaintiff-mother's condition as rubella. We also conclude, at least at the demurrer stage, that he had a duty to inquire as to whether she was pregnant and, if she was, to inform her of the probable effects of rubella upon the fetus, including its irreversible nature.

The plaintiffs also claim the doctor was negligent in failing to advise her of the availability of an abortion. We conclude the doctor did not have a legal duty to so advise the plaintiff-mother under facts alleged in this complaint. There is no question as to the life or health of the mother here. Whether the plaintiff-mother should seek and submit to an abortion is in the first instance a moral decision of the plaintiffs-parents uninfluenced by the doctor. The question of the legal availability of an abortion, particularly at the time in question,[6] called for a legal opinion, not a medical one, which the doctor was not required, or perhaps even competent, to give.

---

[6] The incidents in this case were prior to the decision of the United States Supreme Court in *Roe v. Wade* (1973), 410 U. S. 113, 93 Sup. Ct. 705, 35 L. Ed. 2d 147, rehearing denied, 410 U. S. 959, 93 Sup. Ct. 1409, 35 L. Ed. 2d 694, wherein the court ruled a woman had an unqualified right to a legal abortion during the first trimester of pregnancy.

Subject to the proof at trial, we conclude the doctor was negligent in not diagnosing the rubella the plaintiff-wife was suffering and inquiring as to pregnancy. If the doctor is found at the trial to have been negligent in those respects, it follows he had a duty to inform the plaintiff-mother of the effects of rubella. To complete a cause of action the plaintiffs must then convince the trier of fact that they would have sought and submitted to an abortion of the wife and that the abortion was legally available to them.[7]

If they obtain a favorable finding as to all of these facts they then are entitled to the damages they have sustained because of the deformity and defects of the child. Their damages must be limited to those expenses which they have reasonably and necessarily suffered, and will to a reasonable medical certainty suffer in the future by reason of the additional medical, hospital and supportive expense occasioned by the deformities of the child as contrasted to a normal, healthy child.

In *Rieck v. Medical Protective Co., supra,* public policy considerations as to limitations of liability were invoked at the demurrer stage. Here those considerations must await the findings of fact.

*By the Court.*—Affirmed in part, reversed in part.

ROBERT W. HANSEN, J. *(dissenting).* Where a doctor fails to diagnose German measles in a pregnant patient and the child is born with a birth defect, is the doctor liable for malpractice to (1) the child, or (2) its parents for failing to inform such patient that she was pregnant and that there was an increased possibility that the child she was carrying might be born with a birth defect due to her having German measles? The claim is that the

---

[7] A similar cause of action was recognized in *Jacobs v. Theimer* (Tex. 1975), 519 S. W. 2d 846, and rejected in *Gleitman, supra.*

doctor's failure to diagnose deprived the pregnant patient of the opportunity to terminate the pregnancy.

The doctor is not liable in an action brought on behalf of the child, the majority holds, because the damages claimed cannot be measured by any standards recognized by our law. In so holding, the majority cites, quotes and follows a New Jersey case,[1] the New Jersey court rejecting recovery by such child where a doctor had diagnosed the German measles but allegedly failed to inform the patient that her child could be defective because of such German measles. The New Jersey court held:

". . . The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies. . . ."[2]

The majority states: "We agree with the New Jersey court." So does this writer. However, where the majority goes exactly halfway around the track with the New Jersey court, the writer would go all the way. For the New Jersey court also upheld demurrer to the cause of action of the parents, which our court majority refuses to do. Rejecting the claim of injury by the parents, the New Jersey court held that such cause also involved no damages cognizable by law, stating:

". . . In order to determine their [the parents'] compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and

---

[1] *Gleitman v. Cosgrove* (1967), 49 N. J. 22, 227 Atl. 2d 689.

[2] *Id.* at page 28.

weigh these against the alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform for the infant plaintiff. When the parents say their child should not have been born, they make it impossible for a court to measure their damages in being the mother and father of a defective child."[3]

The writer would follow the reasoning and rationale of the New Jersey court as to the immeasurability of damages both in the action brought on behalf of the child and the action brought by its parents. But more than measurability of damages is involved. The parents' cause of action is based on the claimed denial of their opportunity to terminate the life of their child while he was an embryo. Public policy is involved, exactly as the New Jersey court, in *Gleitman*, said:

". . . Even under our assumption that an abortion could have been obtained without making its participants liable to criminal sanctions, substantial policy reasons prevent this Court from allowing tort damages for the denial of the opportunity to take an embryonic life.

"It is basic to the human condition to seek life and hold on to it however heavily burdened. If Jeffrey could have been asked as to whether his life should be snuffed out before his full term of gestation could run its course, our felt intuition of human nature tells us he would almost surely choose life with defects against no life

---

[3] *Id.* at pages 29, 30. *See also: Stewart v. Long Island College Hospital* (1968), 58 Misc. 2d 432, 296 N. Y. Supp. 2d 41, judgment modified (1970), 35 App. Div. 2d 531, 313 N. Y. Supp. 2d 502, affirmed as modified (1972), 30 N. Y. 2d 695, 332 N. Y. Supp. 2d 640, 283 N. E. 2d 616, the New York court holding: ". . . there is no remedy for having been born under a handicap, whether physical or psychological, when the alternative to being born in a handicapped condition is not to have been born at all. To put it another way, a plaintiff has no remedy against a defendant whose offense is that he failed to consign the plaintiff to oblivion. Such a cause of action is alien to our system of jurisprudence." (58 Misc. 2d at page 436.)

at all. 'For the living there is hope, but for the dead there is none.' Theocritus. . . .

"The right to life is inalienable in our society. A court cannot say what defects should prevent an embryo from being allowed life such that denial of the opportunity to terminate the existence of a defective child in embryo can support a cause for action. Examples of famous persons who have had great achievement despite physical defects come readily to mind, and many of us can think of examples close to home. A child need not be perfect to have a worthwhile life."[4]

It is difficult to see how this conceptual approach of the New Jersey court as to the right to choose life on the part of the child born can be accepted as to cause of the action of the child and not accepted as to the cause of action of its parents. This is particularly true in this state, where a parents' cause of action for injuries sustained by a child has been held to be derivative from the cause of action of the child,[5] our court reasoning that ". . . since the parent takes by operation of law a part of the child's cause of action, he must take it as the child leaves it and that is subject to any defenses which might be urged against the child 'in whom the whole cause of action, but for the law, would vest.' "[6]

What the New Jersey court, in the *Gleitman Case*, said of the public policy considerations that require denial of the cause of action of the parents, here as there, squares with the recent holding of this court denying recovery to parents where a doctor had failed to determine the fact of pregnancy and the parents' claim was that they would have, somehow and somewhere, secured an abortion if they had been timely informed

---

[4] *Id.* at page 30.

[5] *Callies v. Reliance Laundry Co.* (1925), 188 Wis. 376, 206 N. W. 198.

[6] *Schwartz v. Milwaukee* (1972), 54 Wis. 2d 286, 290, 195 N. W. 2d 480, summarizing the earlier *Callies* holding.

of the fact of pregnancy.[7] There this court listed five public policy considerations for denial of recovery on grounds of public policy,[8] and ". . . [a]ny one of these public policy considerations could be sufficient to deny recoverability."[9] The writer finds more than one of the listed five considerations as here applicable to the allegations of this complaint, including (1) the injury is too wholly out of proportion to the culpability of the doctor who missed the German measles diagnosis; (2) allowance of recovery would place too unreasonable a burden upon family physicians; (3) allowance of recovery would be too likely to open the way for fraudulent claims; and (4) allowance of recovery here enters a field that has no sensible stopping point. As to the public policy considerations involved, the suggestion that *Rieck* applies only and is to be limited to cases where a child is normal but unwanted must be rejected. Quite apart from the fact that it smacks too much of a Hitlerian "elimination of the unfit" approach, the fact is that the public policy considerations applied in *Rieck* and *Gleitman* go to the consequences of an allowance of recovery and go far beyond the matter of measurability or even amount of damages claimed in a particular denial-of-opportunity-to-abort case.

---

[7] *Rieck v. Médical Protective Co.* (1974), 64 Wis. 2d 514, 219 N. W. 2d 242.

[8] *Id.* at pages 517, 518, this court holding: "Even where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden (in the case before us, upon physicians and obstetricians); or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point. . . ."

[9] *Id.* at page 518.

Additionally, it is to be noted that in the complaint in *Rieck* the parents expressly alleged that, if they had been advised of the mother's pregnancy, they would have without hesitation sought and obtained an abortion of the unwanted child. In the case before us, nowhere in the complaint do the parents allege what they would have done in the event that they had been advised of the mother's pregnancy and of the increased possibility of a child being born with birth defects due to the German measles during the pregnancy. Nowhere in the complaint is there an affirmative allegation that the parents here would have obtained an abortion if told about the pregnancy and the German measles. Thus, in the case before us, the ". . . unbroken sequence of events establishing cause-in-fact . . ." required by *Rieck* for proximate causation,[10] is not present. Even had such proximate cause been alleged, in *Rieck* our court held that to permit recovery ". . . would open the way for fraudulent claims and would enter a field that has no sensible or just stopping point."[11] That door to fraudulent claims is as wide open here where a child was born with birth defects as it was, in *Rieck*, where the child was born, normal but nonetheless unwanted.

Adding only that the requirement of alleging in the complaint an unbroken sequence of events (establishing a direct and complete chain of causation) was not here met, the writer would follow the reasoning and concur in the result reached by the New Jersey Supreme Court which concluded, in *Gleitman,* as to the parents' claim of cause of action:

"Though we sympathize with the unfortunate situation in which these parents find themselves, we firmly believe the right of their child to live is greater than and precludes their right not to endure emotional and financial injury. We hold therefore that the second and third

[10] *Id.* at page 517.
[11] *Id.* at page 519.

counts [the parents' claim of cause of action] of the complaint are not actionable because the conduct complained of, even if true, does not give rise to damages cognizable at law; and even if such alleged damages were cognizable, a claim for them would be precluded by the countervailing public policy supporting the preciousness of human life."[12]

Thus agreeing with the reasoning and concurring the result reached by the New Jersey court in the case cited, quoted and in part followed by the majority, the writer would affirm the judgment entered by the trial court in this case, both as to the cause of action on behalf of the child and as to the cause of action brought by the child's parents.

[12] *Gleitman v. Cosgrove, supra,* footnote 1, at page 31.