STATE of Wisconsin, Plaintiff-Respondent,

v.

Willie EVANS, Defendant-Appellant.

Supreme Court

*No. 91–1016–CR. Oral argument October 8, 1992.—Decided November 24, 1992.*

(Also reported in 492 N.W.2d 141.)

For the defendant-appellant there were briefs (in the court of appeals) by *Thomas Nelson,* Milwaukee and oral argument by *Thomas Nelson.*

For the plaintiff-respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

STEINMETZ, J.   This case comes to the court on certification from the court of appeals under the provisions of sec. 809.61, Stats.

There are two issues before the court. First, is one who acknowledges in writing that he is the biological father of a child, the child's "parent" under sec. 948.01(3), Stats.,[1]and, therefore, a "person who is

---

[1] Section 948.01, Stats., provides as follows:

responsible for a child's welfare" pursuant to the child neglect statute, sec. 948.21?[2] The trial court answered "yes."

Second, under the stipulated facts, could the trial court find beyond a reasonable doubt that the defendant, as a party to the crime, intentionally contributed to the neglect of Brandon Evans, which resulted in the child's death, and intentionally contributed to the neglect of Chaz Evans, Aquinte Evans, Willie Evans, and Bryant Evans? The trial court answered "yes." We affirm the trial court's finding on both issues.

Under the authority of *Kemp v. State*, 61 Wis. 2d 125, 128–31, 211 N.W.2d 793, 795 (1973), this case was tried to the circuit court on written stipulated facts. The defendant, Willie Evans, was convicted as a party to a crime of four counts of misdemeanor child neglect and one count of felony child neglect with death as a consequence, all contrary to secs. 939.05 and 948.21(1), Stats. In pertinent part, the stipulated facts are detailed below.

---

(3) 'Person responsible for the child's welfare' includes the child's parent; guardian; foster parent; an employe of a public or private residential home, institution or agency; other person legally responsible for the child's welfare in a residential setting; or a person employed by one legally responsible for the child's welfare to exercise temporary control or care for the child.

[2]Section 948.21, Stats., provides as follows:

**Neglecting a child. (1)** Any person who is responsible for a child's welfare who, through his or her actions or failure to take action, intentionally contributes to the neglect of the child is guilty of a Class A misdemeanor or, if death is a consequence, a Class C felony.

(2) Under sub. (1), a person responsible for the child's welfare contributes to the neglect of the child although the child does not actually become neglected if the natural and probable consequences of the person's actions or failure to take action would be to cause the child to become neglected.

Willie Evans admitted that although he never married Theresa Williams, he was the biological father of her five children: Chaz Evans, Aquinte Evans, Willie Evans, and the twins, Bryant and the now deceased Brandon Evans. The children were ages seven, five, three, and four months, respectively, on August 1, 1989, the date that the alleged neglect occurred.

Evans' and Williams' relationship has a long history. By August 1989, Evans had known Theresa Williams for a little over eight years. They lived together for the first two of those years but moved to separate quarters after Chaz Evans was born. Despite these separate living arrangements, Evans still stayed with Williams on some weekends. This practice stopped, however, a couple of months prior to August 1, 1989. Evans explained that Williams started acting crazy. She began a relationship with another man and would not let Evans into her house located at 1913 N. 28th Street, Milwaukee, so that he could be with her. As a result, Evans scaled back his visits to Williams' home to once or twice per week to see the children.

The last time Evans was at Williams' home prior to August 1, 1989, was on July 16, 1989. He was drinking with her family, and for an undisclosed reason, the family beat him up and threw him out of the house. As a result of this beating, Evans suffered a fractured cheekbone requiring medical attention.

On August 1, 1989, the day of the alleged neglect, Evans went to Williams' home to visit the children. Seven-year-old Chaz Evans answered the door. The children were alone. Evans noticed that Brandon looked very sick. His eyes were partially open but he was not moving. When Evans touched Brandon, he moved and his eyes opened.

Realizing that Brandon needed medical care, Evans set out to find Theresa Williams. He talked to some people in the area who told him where she was located. Evans called that location and spoke with her. He told Williams that Brandon looked sick and that she should come home immediately. He then went back to Williams' residence to wait for her. When she did not come home right away, he called Williams a second time. He again told her that Brandon was really sick and that she should come home right away.

After this second call, Evans went outside of Williams' residence to look for. her and saw her coming towards the home. He ran up to her and asked her if he should call an ambulance. She said no because she had a friend who was going to take her and Brandon to the hospital. Williams pointed up the block to an automobile. Evans then walked up to the man in the car and told the man that Williams needed to get the baby to the hospital. The man said that he would take them.

Evans then left the area. He stated that he assumed Williams would get medical attention for Brandon. Consequently, he did not follow-up on Brandon's condition.

On August 2, 1989, at approximately 7:00 a.m., Brandon Evans' body was discovered wrapped in a jacket and lying on the rear steps of a residence located at 1932 North 29th Street, Milwaukee. An autopsy revealed that Brandon's death was caused by malnutrition and dehydration.

An investigation of the death lead Milwaukee police to Williams' residence on the morning of August 3, 1989. They found her. children: Chaz, Aquinte, Willie, and Bryant home alone. They were barricaded into the front room of the residence by a heavy oak door with a couch wedged in front of it. The children appeared malnourished. Medical personnel were summoned and the chil-

dren were taken to the Children's Hospital of Wisconsin. Hospital personnel observed that Bryant Evans was weak, dirty and emaciated. They diagnosed him as suffering from malnutrition. Aquinte Evans smelled of a foul odor, was dirty and had old lesions on his body. Willie Evans was also dirty and also had old scarring on his body.

After the children were taken to the hospital, the police more thoroughly investigated Williams' home. It consisted of six rooms including a kitchen and bathroom. They first entered the living room where there were dirty diapers thrown on the floor, as well as numerous butter knives and working cigarette lighters strewn about. The room had a strong order of urine and feces. In the far north of this room, the floor was soaked with water. The room also contained live wires which were plugged into unsafe outlets in positions where they could have been touched by the children. There was a television set which was sitting on a table that had the back removed so that the children could put their hands into it. Upon entering the kitchen area, the police found the kitchen sink filled with dirty dishes and overflowing with water. The kitchen floor was beginning to rot and turn upwards. The freezer contained two jars of peanut butter and what appeared to be spoiled food. There was a liter of soda in the refrigerator. There was no other edible food in the home. Upon entering the bathroom, the police found the bathtub and sink filled with dirty water. The floor was rotted, wet, and slippery. The police then proceeded into the bedrooms. In one of them they observed some cribs, as well as mattresses on the floor. The mattresses on the floor and in the crib were extremely filthy and urine stained. On one of the floor mattresses there was, a ten-inch butter knife. The room smelled strongly of urine. There were feces and dirty

diapers in the room. In the second bedroom, the police found soiled mattresses, dirty clothes piled on the floor, and numerous butter knives strewn about. The carpeting was very soiled and filthy. The police also noticed that the house was extremely hot because all of the windows and doors were locked tight.

In *Ynocencio v. Fesko,* 114 Wis. 2d 391, 396, 338 N.W.2d 461 (1983), the court stated: "The interpretation of a statute and the determination of its applicability to a stipulated fact situation are questions of law which this court ordinarily can decide without giving deference to the decision of the trial court." *See Hall Chevrolet Co., Inc. v. Dept. of Revenue,* 81 Wis. 2d 477, 483, 260 N.W.2d 706 (1978).

Section 948.21(1), Stats., provides as follows: "Any person who is responsible for a child's welfare who, through his or her actions or failure to take action, intentionally contributes to the neglect of the child is guilty of a class A misdemeanor or, if death is a consequence, a Class C felony." The term "person who is responsible for a child's welfare" is defined in sec. 948.01(3), Stats., as "includ[ing] the child's parent . . .."

The charges against the defendant and his convictions on all five counts rested on the trial court's conclusion that Evans was the "parent" of the five neglected children as that term is used in sec. 948.01(3), Stats.

The defendant challenges this conclusion. He argues that since ch. 948 does not explicitly define the term "parent," the definition of that term found in the Children's Code, ch. 48 of the Wisconsin Statutes, should apply. Section 48.02(13), Stats., defines "parent" as follows:

> 'Parent' means either a biological parent, a husband who has consented to the artificial insemina-

477

tion of his wife under s. 891.40, or a parent by adoption. If the child is a nonmarital child who is not adopted or whose parents do not subsequently intermarry under s. 767.60, 'parent' includes a person adjudged in a judicial proceeding to be the biological father. 'Parent' does not include any person whose parental rights have been terminated.

The defendant further asserts that the second sentence of sec. 48.02(13), Stats., is operative in this case, because he neither married Williams nor adopted her five children. Consequently, because he has never been "adjudged in a judicial proceeding to be the biological father" of the children, he was not their "parent" for purposes of sec. 948.01(3) when the alleged neglect occurred. As a result, he alleges that his convictions must be vacated.

The defendant attempts to buttress his argument with two Wisconsin cases, *State v. Duprey,* 149 Wis. 2d 655, 439 N.W.2d 837 (Ct. App. 1989) and *Slawek v. Stroh,* 62 Wis. 2d 295, 215 N.W.2d 9 (1974). He cites *Duprey,* 149 Wis. 2d at 658, for the proposition that "an unmarried father's legal obligation to support a child may not exist until paternity is established." He cites *Slawek,* 62 Wis. 2d at 308, for the proposition that a biological father of children born out of wedlock cannot obtain legal status as the children's parent unilaterally. A court must decide that he is a parent after hearing from the mother and from the children's guardian ad litem. *Id.* The defendant argues that both of these cases support his assertion that he is not responsible for the five neglected children under sec. 948.21, Stats., because he has never been adjudicated their father.

Examination of the defendant's argument reveals three fatal flaws. First, he cites no authority to support his position that the ch. 48 definition of parent should be

used in ch. 948. Various definitions of the term "parent" appear throughout the Wisconsin statutes. *See e.g.,* secs. 46.56(1)(j), Stats., 46.98(1)(c), 46.985(1)(f), 48.02(13), 51.40(1)(i), 103.10(1)(f), 115.76(6), 146.34(1)(f) and 303.068(1m). The defendant arbitrarily seizes on one definition of parent, sec. 48.02(13), and argues that he does not fall within it.

He does so in the face of strong evidence of legislative intent to the contrary. The legislature could have expressly provided that the word "parent" in sec. 948.01(3), Stats., has the same meaning as specified in the Children's Code, but it did not. This omission is particularly significant, given that the legislature has explicitly provided that "parent" when used in sec. 51.40 has the meaning specified under sec. 48.02(13). The absence of a similar provision in ch. 948 is evidence that the legislature did not intend sec. 48.02(13)'s definition of parent to control the meaning in sec. 948.21.

The second flaw in the defendant's argument emanates from his reliance on *Duprey* and *Slawek.* Neither case supports his position.

In *Duprey,* 149 Wis. 2d at 658, the court of appeals stated that an "unmarried father's legal obligation to support a child may not exist until paternity is established." By using the permissive "may" the court recognized that there are situations in which an unmarried father has no legal obligation to support a nonmarital child absent a paternity finding, such as where the father is not even on notice that he has sired an illegitimate child. The language used in the case does not mean that an unmarried father never has a legal obligation to support his nonmarital offspring.

*Slawek,* 62 Wis. 2d at 300, did not involve a prosecution for child neglect. It dealt with a declaratory judgment action seeking a judicial declaration of paternity.

*Id. Slawek* does not suggest that one who has admitted in writing to being the father of nonmarital children cannot be prosecuted for criminally neglecting them.

The final flaw in the defendant's argument stems from the language of sec. 948.01(3), Stats., itself. Based on that section's wide ranging definition of the phrase "person responsible for the child's welfare" in sec. 948.21(1), one can infer that the legislature intended to make the definition of "parent" in sec. 948.01(3) as all inclusive as possible in the context of the child neglect statute. Not only does sec. 948.01(3) list six separate categories of individuals responsible for a child's welfare, it also uses the verb "includes," which is normally a term of enlargement rather than limitation. *Milwaukee Gas Light Co. v. Dept. of Taxation,* 23 Wis. 2d 195, 203-04, 127 N.W.2d 64 (1964); *State v. Caldwell,* 154 Wis. 2d 683, 688, 454 N.W.2d 13 (Ct. App. 1990). Thus, the category of persons responsible for a child's welfare may include classes of persons in addition to those spelled out in sec. 948.01(3). This inclusive intent undermines the defendant's argument for limitation.

In view of these three flaws, we reject the defendant's argument to limit ch. 948's coverage of the term "parent" to the definition contained in the Children's Code. Alternatively, we hold that the term "parent" in sec. 948.01(3) is self-contained and includes a biological parent.

This holding comports with the legislature's implicit intent to broadly define the category of persons responsible for a child's welfare. It also comports with the obvious purpose of sec. 948.21, Stats., to protect marital and nonmarital children. In light of this purpose, the statute should be applied as evenhandedly as possible

to both classes of children subject, of course, to the demands of due process. The defendant's position, by allowing an admitted father of a nonmarital child to escape liability just because he had not been declared the father in a judicial proceeding, would arbitrarily lessen the protection afforded to nonmarital children.

The record in this case establishes beyond a reasonable doubt that the defendant was the biological parent of the five neglected children. By signing the stipulated facts, the defendant admitted in writing that he is the children's biological father. He also admitted that even after Theresa Williams barred him from her residence, he would come by to see the children once or twice a week. Finally, all five of the children bore the defendant's surname.

The model jury instruction for sec. 948.21, Stats., under which the defendant was convicted, defines the criminal neglect element of the statute as follows:

> The second element of this offense requires that the defendant intentionally contributed to the neglect of (name of child). This element requires not only that the defendant contributed to the neglect of a child but also that the act or failure to act was done intentionally. The term 'intentionally' means that the defendant either had a purpose to do the thing or cause the result specified or was aware that his conduct was practically certain to cause that result.
>
> A child is neglected when the person responsible for the child's welfare fails for reasons other than poverty to provide necessary care, food, clothing, medical or dental care, or shelter so as to seriously endanger the physical health of the child. (Footnotes omitted.)

Wis. J.I.—Criminal 2150 (1989).

The facts to which the defendant stipulated establish beyond a reasonable doubt that the defendant's conduct as it related to Brandon Evans constituted criminal neglect. This is so because the defendant knew or reasonably should have known that Theresa Williams could not be trusted to provide Brandon Evans with timely medical care. Consequently, leaving Brandon in her custody was neglectful. He should have taken independent action to assure that Brandon received the care he needed.

Several facts indicate that Evans should have known that Williams was unreliable. First, when the defendant saw Brandon Evans on August 1, 1989, the day of the child's death, the baby looked "very sick" and was not moving. Despite this fact, Theresa left Brandon and the other four Evans children, the oldest of whom was seven, alone in the apartment. Second, when he first telephoned Williams about Brandon's illness, she did not immediately reply. He had to call her a second time before she responded. Third, as is described more graphically below, when Evans found them, the children exhibited signs of severe neglect and were living in conditions unfit for human habitation. Finally, Evans himself stipulated that Williams had been "acting crazy" for a few months.

The facts also clearly indicate that Evans failed to assure Brandon's safety. Despite the above-mentioned indicia of Williams' unreliability, he left Brandon in her care. He could have taken Brandon to the hospital himself. He could have called an ambulance. He could have called the police and the department of social services. He did not even follow-up with Williams to assure that she kept her promise to take Brandon to the hospital. The stipulated facts also establish beyond a reasonable doubt that the defendant neglected the other four chil-

dren. The children were kept in deplorable and dangerous conditions. The defendant knew of these conditions, and the defendant made no effort to remove the children from them.

The deplorable conditions of Williams' children and home on the morning of August 3, 1989 are described above; however, they bear repeating for the misdemeanor convictions. The house smelled of urine and feces. The kitchen and bathroom floors were rotting. In the living room, there were dirty diapers, numerous butter knives, and working cigarette lighters all over the floor. The room also contained live wires, unsafe outlets, and a television set with the protective cover removed. All of these electrical dangers were in places accessible to the children. The bedrooms contained more dirty diapers, more butter knives, and filthy urine stained mattresses. The children were dirty, smelled foul, and malnourished. Bryant was emaciated. Aquinte and Willis had old scarring on their bodies. Finally, there was no food in the house except for a liter of soda and peanut butter.

The defendant had to be aware of the overall condition of the home when he saw Brandon on August 1. The terrible odor in the home, the rotting floors, the dirt, stench, and lesions on the children, the children's obvious malnutrition, the numerous dirty diapers, and the urine stained mattresses indicate that the deplorable conditions present on the morning of August 3 did not develop overnight. Nor would it be possible for one to enter the home and not notice its general unfitness.

Moreover, the defendant clearly made no effort to remove the children from these deplorable conditions. As far as the record shows, he did not try to find someone to care for the children after it appeared that their mother was leaving for the hospital with Brandon at his urging.

Instead, the defendant left the children unsupervised in a continuing unsanitary and dangerous environment with which he was very familiar.

For the foregoing reasons, we find that Willie Evans was responsible for Theresa Williams' five children and that his actions with respect to the children constituted criminal neglect.

*By the Court.*—The judgment of the circuit court for Milwaukee county is affirmed.