DAVID T. PROSSER, J.
¶ 164. {dissenting). Dale and Leilani Neumann are not likely to be viewed sympathetically by people who read the statement of facts in the majority opinion. The Neumanns' reaction to their daughter's illness was so inconsistent with the normative behavior of most contemporary parents that it is hard for people to identify with them or to understand their thinking and values.
¶ 165. It would be easy to look away from such unconventional defendants and say nothing. But the issues involved in these cases are too important for me to remain silent. First, the facts are not as black and white as they initially appear. Second, the law governing the facts is imprecise and quite confusing. Finally, the trials of the two defendants were problematic in several respects.
¶ 166. The primary purpose of this writing is not to try to change the result but to encourage the bench, the bar, and the Wisconsin Legislature to revisit some of the troublesome questions these cases present.
*531 I
¶ 167. Madeline Kara Neumann, 11, died from diabetic ketoacidosis resulting from untreated juvenile onset diabetes mellitus. Majority op., ¶ 1. The theory of the prosecution and of the majority is that Kara would still be alive if her parents had provided her with medical care.
¶ 168. Diabetic ketoacidosis (DKA) is one of the most serious complications of diabetes. Michelle A. Charfen & Madonna Fernandez-Frackelton, Diabetic Ketoacidosis, 23 Emergency Med. Clinics N. Am. 609, 609 (2005). It is a life-threatening condition that requires prompt hospitalization and treatment. Malcolm Nattrass, Diabetic ketoacidosis, 34 Med. 104, 104 (2006). Even minor delays in recognizing the condition can have an effect on survival. Id. DKA results from insulin deficiency and excess insulin counter-regulatory hormones. Charfen, supra, at 609. Before the discovery of insulin in 1921, DKA caused death in 100 percent of cases, but now that insulin is available for treating diabetes, DKA's rate of mortality has declined to between four percent and ten percent. Id. However, mortality rates are higher when patients seek treatment from non-specialists. Lynne Jerreat, Managing diabetic ketoacidosis, 24 Nursing Standard 49, 50 (Apr. 28, 2010). Every year, there are approximately 100,000 hospitalizations for DKA in the United States, and new-onset diabetics make up 30 percent of patients who develop DKA. Charfen, supra, at 610.
¶ 169. DKA often causes vague symptoms like fatigue, nausea, vomiting, and abdominal pain. Id. In addition, patients often complain of excessive urination, thirst, and hunger, which are more suggestive of DKA. Id. Roughly 25 percent of patients produce vomit *532 with a coffee ground appearance. Id. Patients with DKA appear exhausted and dehydrated and may have Kussmaul respirations, a "pattern of deep, sighing respirations." Id. at 613. Also, the breath of DKA patients may have a fruity odor due to acetone in their breath. Id. However, not everyone can smell ketones, so the fruity smell is not always a reliable way to diagnose the condition. Jerreat, supra, at 49. DKA patients may not be entirely conscious as the condition progresses, and in severe cases, the patient may slip into a coma. Charfen, supra, at 613-14. Symptoms such as acute abdominal pain could result from a variety of conditions, and non-specialists, as opposed to endocrinologists, may be more likely to order extra diagnostic tests and procedures that delay diagnosis. Claresa S. Levetan, Kathleen A. Jablonski, Maureen D. Passaro, & Robert E. Ratner, Effect of Physician Specialty on Outcomes in Diabetic Ketoacidosis, 22 Diabetes Care 1790, 1793 (1999).
¶ 170. DKA is more common in children under five years of age and in children whose families lack access to proper health care. Joseph Wolfsdorf, Nicole Glaser, & Mark A. Sperling, Diabetic Ketoacidosis in Infants, Children, and Adolescents, 29 Diabetes Care 1150, 1151 (2006). A recent survey revealed that children are at a higher risk of developing DKA if their parents have low incomes and low educational achievements. Id. DKA is also more prevalent when the family does not have health insurance because the parents delay seeking treatment. Id.
¶ 171. In this case, the majority opinion explains that "Kara had suffered gradually worsening symptoms for a few weeks before her death, leading to frequent thirst and urination, dehydration, weakness, and exhaustion." Majority op., ¶ 11. The parties stipulated, *533 however, that "to the casual observer, . . . Kara would have appeared healthy as late as the Thursday before she died." Id.
¶ 172. According to the majority, Kara did some of her homework on Friday, March 21, 2008, but was too tired to finish. Id., ¶ 12. She ate dinner in her bedroom. Id. The majority does not state whether either of the Neumanns remained at home during the day on Friday, but one of the briefs asserts that Leilani Neumann came home from work about 6:00 p.m.
¶ 173. On Saturday, Kara had the capacity to ask her parents whether she could stay home instead of going to work at the family's coffee shop. Id. Leilani left to work at the shop, returning home Saturday afternoon. Id. According to his brief, Dale stayed home to work on the family's taxes. When Leilani arrived home she "knew that something was wrong [with Kara] and called her husband into the room. The parents began rubbing Kara's legs and praying for her." Id.
¶ 174. From the facts set out in the majority opinion, it appears that the critical time period to examine is the period from Saturday afternoon, when Leilani returned from work, to Sunday afternoon when Kara died.
¶ 175. When Leilani returned home, "Kara was pale and her legs were skinny and blue." Id. She had slept all day. Id. The parents realized that their daughter was ill and they began to pray, and to enlist others to pray as well. Id., ¶¶ 13, 15-16.
¶ 176. Paragraphs 17-27 of the majority opinion describe the last 23-24 hours of Kara's life. There are facts and descriptions in the State's briefs that paint an even more disturbing picture of events than the account in the majority opinion. However, there are representa *534 tions of fact in the briefs of the two defendants that layout a different, more optimistic view of the situation.
¶ 177. There is some dispute about when Kara went into a coma. A coma is a "state of deep, often prolonged unconsciousness ... in which an individual is incapable of sensing or responding to external stimuli and internal needs." The American Heritage Dictionary of the English Language 376 (3d ed. 1992). A coma is often described as a state in which a person cannot be awakened and does not respond normally to light, sound, or painful stimuli.
¶ 178. The majority states that the Neumann juries could find that Kara was "in a coma-like condition for 12 to 14 hours." Majority op., ¶ 86. The statement appears to be consistent with representations in Dale's brief that, on Sunday morning, Kara moved her head and moaned in response to attempts to communicate with her. It is not consistent with representations that Kara was in a coma for many hours before her death.
¶ 179. In the majority opinion, there is no assertion that Kara vomited or that any vomit had a coffee ground appearance. There is no representation that the Neumanns suspected or were told that their daughter had a diabetic condition or that they detected a fruity odor on Kara's breath.
¶ 180. The majority acknowledges the Neumanns' continuing (though clearly mistaken) belief that Kara had a fever or the flu, and their mistaken perception that, on Sunday morning, she was marginally better than she had been. See id., ¶¶ 17, 20. The majority emphasizes the Neumanns' reservations about their conduct and the advice of those who suggested that they do more for their daughter. It does not mention that such advice was not universal.
*535 ¶ 181. DKA is a very dangerous condition but it is not always a condition whose gravity is quickly recognized.[1] To illustrate, DKA was at issue in a medical malpractice case decided by this court in 2004. Maurin v. Hall, 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866, overruled by Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, 293 Wis. 2d 38, 717 N.W.2d 216.
¶ 182. During the first few days of March 1996, five-year-old Shay Leigh Maurin had not been feeling well. Id., ¶ 10. "She was lethargic, drinking fluids all day and eating poorly." Id. Shay's mother took her to a clinic on March 5 where a physician assistant examined her. Id. He diagnosed the child as having an ear infection and prescribed antibiotics. Id. However, he "advised that Shay should have a fingerstick blood test — used to check for diabetes — if her symptoms did not improve." Id.
¶ 183. "Shay's condition worsened rapidly over the next 24 hours. She was unable to eat, she vomited and dry-heaved, and the fruity odor of her breath led her mother to fear she might have diabetes." Id., ¶ 11. The mother brought Shay to a hospital late in the evening of March 6. Id. At this point, according to the opinion, "Shay's diabetes had progressed to acute dia *536 betic ketoacidosis." Id. However, the hospital physician who examined her failed to diagnose any diabetic condition. Id.
¶ 184. The following morning, March 7, when Shay returned to the hospital, she was in serious pain. Id., ¶ 12. A different doctor diagnosed acute DKA "and attempted treatment before transferring Shay to Children's Hospital of Wisconsin. Shay lost consciousness during the ambulance ride to [the hospital] and died the next day," March 8. Id.
¶ 185. In retrospect, it is hard to imagine how the first doctor at the hospital failed to diagnose the situation, but he did. According to the facts in the opinion, the child was placed in an ambulance before she lost consciousness. Because she died the next day, she must have been under medical care for at least 12 hours.
¶ 186. The facts in Maurin are at odds with the majority's black and white narrative here and suggest that DKA does not manifest the same symptoms or follow the same timeline in every case.
¶ 187. I do not read the majority opinion as faulting the Neumanns for failing to diagnose Kara as having DKA. I read the majority opinion as holding that the Neumanns, after observing Kara's condition, had a duty to provide her with medical care because the failure to do so created an unreasonable and substantial risk of death or great bodily harm (that is, bodily injury which creates a substantial risk of death or other enumerated physical injuries). According to the majority, the Neumanns were aware of "that risk," and their failure to provide medical care caused Kara's death.
¶ 188. The overriding issue in this case is whether the Wisconsin Statutes gave the Neumanns fair notice of their "duty" to act. A larger issue is how this parental "duty" will be interpreted in cases where a parent is *537 confronted with similar symptoms that do not arise from DKA.
II
¶ 189. Wisconsin Stat. § 940.01(l)(a) reads in part: "[W]hoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony." Wis. Stat. § 940.01(1)(a) (emphasis added). This statute, which has no relationship whatsoever to the present case, is generally regarded as the most serious homicide statute. It is cited here merely to highlight the element of intent. The phrase "with intent to" is defined in Wis. Stat. § 939.23 (Criminal intent) in subsection (4) as follows:" 'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23(4).
¶ 190. Proving intent can be a challenge for prosecutors, but establishing criminal intent demonstrates culpability.
¶ 191. Wisconsin Stat. § 948.21 is the child neglect statute. This statute reads, in part:
(1) Any person who is responsible for a child's welfare who, through his or her actions or failure to take action, intentionally contributes to the neglect of the child is guilty of one of the following:
(a) A Class A misdemeanor.
(b) A Class H felony if bodily harm is a consequence.
(c) A Class F felony if great bodily harm is a consequence.
(d) A Class D felony if death is a consequence.
Wis. Stat. § 948.21(1).
*538 ¶ 192. Wisconsin Stat. § 948.21(l)(d) does have a relationship to this case. It is directed toward "[a]ny person," including a parent, "who is responsible for a child's welfare." Wis. Stat. § 948.21(1) (emphasis added). It specifically contemplates a "failure to take action" that "contributes to the neglect of the child." Id. Wisconsin juries have long been told that "[a] child is neglected when the person responsible for the child's welfare fails for reasons other than poverty to provide necessary care, food, clothing, medical or dental care, or shelter so as to seriously endanger the physical health of the child." Wis JI — Criminal 2150; see also State v. Evans, 171 Wis. 2d 471, 481, 492 N.W.2d 141 (1992); cf. Wis. Stat. § 48.02(12g) (defining neglect).
¶ 193. The penalty for child neglect that results in a child's death is a Class D felony. Wis. Stat. § 948.21(l)(d). This is the same as the penalty for a violation of Wis. Stat. § 940.06, second-degree reckless homicide.
¶ 194. Unlike Wis. Stat. § 940.06, however, Wis. Stat. § 948.21, the child neglect statute, contains an intent element. A person cannot be convicted under the child neglect statute unless the person "intentionally contributes to the neglect of the child." (Emphasis added.)
"Intentionally" means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result. In addition, ... the actor must have knowledge of those facts which are necessary to make his or her conduct criminal and which are set forth after the word "intentionally!.]"
Wis. Stat. § 939.23(3).
*539 ¶ 195. In prosecuting the Neumanns, the State either overlooked or consciously chose not to prosecute under Wis. Stat. § 948.21(l)(d). The State's decision avoided the necessity of proving intent. Instead, the State charged the defendants, in separate cases, with second-degree reckless homicide: "Whoever recklessly causes the death of another human being is guilty of a Class D felony." Wis. Stat. § 940.06(1).
¶ 196. This statute requires a lot of interpretation. To explain "recklessly," the majority turns to the definition of "criminal recklessness" in Wis. Stat. § 939.24(1): " '[C]riminal recklessness' means that the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk." (Emphasis added.) The defined term is then converted to an adverb for use in Wis. Stat. § 940.06.
¶ 197. The statutory definition of "criminal recklessness" contemplates an actor creating an unreasonable and substantial risk of death or an unreasonable and substantial risk of great bodily harm and being "aware of that risk." Wis. Stat. § 939.24(1). This requires consideration of the definition of "great bodily harm," which is defined, in part, as "bodily injury which creates a substantial risk of death." Wis. Stat. § 939.22(14).
¶ 198. There is no statutory definition of "creates" or "substantial risk" or "aware" to turn to in applying "criminal recklessness."
¶ 199. Wisconsin Stat. § 940.06, the second-degree reckless homicide statute, appears to be simple enough to apply when a person is creating an unreasonable risk of serious harm to another by the person's action. For example, shooting a gun in the direction of a crowd of people creates an unreasonable and substan *540 tial risk of death or great bodily harm. The statute is more difficult to apply when the person is not acting but failing to take action.
¶ 200. In the present case, many people failed to act: Kara's parents, her siblings, her grandparents, some of the people who visited the Neumann family at their home. All these people could have acted to alert authorities or summon medical care, but they did not. Only the Neumanns have been prosecuted because, presumably, only the Neumanns had a "duty" to act. Thus, enforcement of the statute requires us to determine who had a duty to act and what that duty was. These elements must be imported into the reckless homicide statute.
¶ 201. Wisconsin Stat. § 940.23(2)(a) is the second-degree reckless injury statute. It reads: "Whoever recklessly causes great bodily harm to another human being is guilty of a Class F felony." This statute also requires us to examine definitions of "recklessly" and "great bodily harm." See Wis. Stat. §§ 939.24(1), 939.22(14). The majority appears to believe that the Neumanns could have been prosecuted under § 940.23(2)(a) for their failure to take action to provide medical care for Kara even if she had lived.
¶ 202. What is confusing, however, is that Wis. Stat. § 940.23(2)(a) appears to be very close to Wis. Stat. § 948.03(3)(a), which reads: "Whoever recklessly causes great bodily harm to a child is guilty of a Class E felony." The former statute refers to the victim as "another human being," whereas the latter refers to "a child." Otherwise, the two statutes use the same words and reach at least some of the same conduct.[2]
*541 ¶ 203. Significantly, subsection (6) of Wis. Stat. § 948.03 then provides:
Treatment through prayer. A person is not guilty of an offense under this section solely because he or she provides a child with treatment by spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4. or 448.03(6) in lieu of medical or surgical treatment.
¶ 204. The majority is undaunted by the clear overlapping of Wis. Stat. § 940.23(2)(a), the second-degree reckless injury statute, and Wis. Stat. § 948.03(3)(a) in terms of a person's action or inaction. The majority points out that the immunity granted in § 948.03(6) applies only to § 948.03. Majority op., ¶ 50. It asserts that the definition of "recklessly" in Wis. Stat. § 940.06 and, by implication, § 940.23, is different from the definition of "recklessly" in § 948.03 and Wis. Stat. § 939.24(1). Id., ¶ 73. It declares that it "is apparent... in reading the text of the statutes, that the phrase 'great bodily harm' is used in different ways in these statutes." Id., ¶ 65.
¶ 205. It is true that the immunity granted by Wis. Stat. § 948.03(6) applies only to § 948.03. But as long as that immunity exists, it creates uncertainty about whether specific conduct is immune from prosecution.
¶ 206. The majority attacks this uncertainty, first, by declaring that "[n]o one reading the treatment-through-prayer provision should expect protection from criminal liability under any other statute," majority op., ¶ 50, which would include the unmentioned, overlap *542 ping Wis. Stat. § 940.23(2)(a), and, second, by hinting that the immunity in Wis. Stat. § 948.03(6) should be limited through judicial construction. Id., ¶ 51. But there is still confusion in the law.
¶ 207. The different definitions of "recklessly" demonstrate how "great bodily harm" operates differently in the two separate statutory schemes. In Wis. Stat. § 940.06, "great bodily harm" is incorporated into the definition of recklessness to describe the nature of the prohibited conduct, whereas in Wis. Stat. § 948.03(3)(a) "great bodily harm" is used to describe the result of the prohibited conduct. Section 940.06(1) prohibits reckless conduct that results in death, where the reckless conduct means an action that "creates an unreasonable and substantial risk of death or great bodily harm." Wis. Stat. § 939.24(1) (emphasis added). In contrast, § 948.03(3)(a) prohibits reckless conduct that causes great bodily harm, where the reckless conduct means "conduct which creates a situation of unreasonable risk of harm." Wis. Stat. § 948.03(1) (emphasis added). Thus, the difference is that Wis. Stat. § 940.06(1) prohibits behavior that creates a greater risk (great bodily harm), whereas Wis. Stat. § 948.03(3)(a) prohibits behavior that creates a smaller risk (harm).
¶ 208. If the difference between the use of "great bodily harm" in Wis. Stat. § 940.06(1) and Wis. Stat. § 948.03(3)(a) saves the two statutes from a collision, the same cannot be said of § 948.03(3) (c). Section 948.03(3)(c) inexplicably states, "[wjhoever recklessly causes bodily harm to a child by conduct which creates a high probability of great bodily harm is guilty of a Class H felony." Wis. Stat. § 948.03(3)(c). This section is severely flawed because it contains a double description of the prohibited conduct. Section 948.03 uses "recklessly" to mean conduct that "creates a situation of *543 unreasonable risk of harm," § 948.03(1), but the statute goes further to define the prohibited conduct as that "which creates a high probability of great bodily harm." Wis. Stat. § 948.03(3)(c). It is this definition of prohibited conduct within § 948.03(3)(c) that destroys fair notice.
¶ 209. Wisconsin Stat. § 940.06(1) and Wis. Stat. § 948.03(3)(c) regulate the same conduct and therefore do not provide fair notice. The "high probability of great bodily harm" in § 948.03(3)(c) is almost identical to the "substantial risk of death or great bodily harm" in Wis. Stat. § 940.06(1). See Wis. Stat. § 939.24 (defining criminal recklessness as it applies to § 940.06(1)). It is possible to quibble over whether "high probability of great bodily harm" is more or less severe than "substantial risk of great bodily harm," but criminal liability should not depend on an unwinnable battle over semantics. Therefore, Wis. Stat. § 940.06(1) and Wis. Stat. § 948.03(3)(c) prohibit the same conduct and differ only by the prohibited result. Since § 948.03(6) provides a treatment-through-prayer immunity for the conduct in § 948.03(3)(c), the parents should not be liable for that same conduct under Wis. Stat. § 940.06(1).
¶ 210. In addition to the different uses of "great bodily harm" and different definitions of "recklessly," the majority suggests that the subjective awareness requirement in Wis. Stat. § 940.06(1) mitigates any vagueness because it requires the actor to be aware of the unlawfulness of the conduct. Majority op., ¶ 77. However, that reasoning is not persuasive where the vagueness makes it impossible for parents to know what conduct is unlawful. Under the Neumanns' interpretation of the statute, it was perfectly lawful for them to create a high probability of great bodily harm because the treatment-through-prayer immunity in Wis. Stat. § 948.03(6) allowed that conduct. Therefore, it is *544 hard to see how being subjectively aware of a risk that the parents believed was lawful could assuage vagueness that makes it impossible to determine when conduct is not lawful.
¶ 211. The word "aware" in the Wis. Stat. § 939.23 definition of "intentionally" (that is, "aware that his or her conduct is practically certain to cause [a] result") should be contrasted with the word "aware" in the Wis. Stat. § 939.24 definition of "criminal recklessness" ("aware of that risk"). When "that risk" is not definite, the awareness of "that risk" cannot be definite, either.
¶ 212. The majority opinion explains that the due process issue in these prosecutions is "whether the applicable statutes are definite enough to provide a standard of conduct for those whose activities are proscribed." Majority op., ¶ 33.
Fair notice is part of the due process doctrine of vagueness. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application^] violates the first essential of due process of law."
Id. (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).
¶ 213. The Neumanns claim that the reckless homicide statute is too murky to give sufficient notice as to when parental choice of treatment through prayer becomes illegal. Given the nature of Kara's illness, as well as the imprecision in the statutory language, I agree. There is a due process problem here. On the facts before us, the statutes are very difficult to understand and almost impossible to explain. Indeed, the statutory scheme is so difficult to explain that if a prayer-treating parent were to consult an attorney on how he or she *545 could prayer treat and stay within the bounds of the law, virtually any attorney would be at a loss to reasonably advise the client. The concerns stated would not have been so pronounced if the Neumanns had been prosecuted under the child neglect statute, Wis. Stat. § 948.21(l)(d).
Ill
¶ 214. The second-degree reckless homicide statute (Wis. Stat. § 940.06) is different from the child neglect statute (Wis. Stat. § 948.21) in that it does not include any explicit language authorizing the prosecution of death caused by omission. The Neumanns concede, however, that defendants may be prosecuted for reckless homicide if they violate a known legal duty to act. State ex rel. Cornellier v. Black, 144 Wis. 2d 745, 758, 425 N.W.2d 21 (Ct. App. 1988).
¶ 215. In Cornellier, the court said:
It is just as much an "act" to deliberately or recklessly refrain from performing a known legal duty as it is to negligently perform that duty. We conclude, therefore, that the statute, impliedly, if not directly, acknowledges that the crime of reckless homicide may be committed by omission, as well as commission.

Id.

¶ 216. This principle may be sound but the truth is that Cornellier was decided under a statute that was repealed and was different from the current statute. The former statute read as follows:
Homicide by reckless conduct. (1) Whoever causes the death of another human being by reckless conduct is guilty of a Class C felony.
*546 (2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin.
Wis. Stat. § 940.06 (1985-86).
¶ 217. Cornellier also was heavily influenced by an alleged omission case, State v. Williquette, 129 Wis. 2d 239, 385 N.W.2d 145 (1986). Williquette also was decided under a different statute, Wis. Stat. § 940.201 (1983-84), which provided, in part, "[wjhoever ... subjects a child to cruel maltreatment, including... severe bruising, lacerations, fractured bones, burns, internal injuries or any injury constituting great bodily harm ... is guilty of a Class E felony." Williquette, 129 Wis. 2d at 242 n.l (quoting Wis. Stat. § 940.201) (emphasis added). The word "subjects" can mean "[t]o expose to something"[3] in contrast, say, to bruise, cut, fracture, or burn. "Exposing" a person to danger may be viewed as an "act" or as a failure to act through passivity.
¶ 218. In any event, both Williquette and Cornellier speak, directly or indirectly, of a defendant's failure to perform a "known legal duty." This inevitably presents the question of what "known legal duty" the Neumanns failed to perform.
¶ 219. The Neumanns' "known legal duty" had to be inserted into the standard jury instruction for second-degree reckless homicide. See Wis JI — Criminal 1060. The jury instruction in Leilani Neumann's case read as follows:
*547 Second-degree reckless homicide is defined in Section 940.06 of the Criminal Code of Wisconsin, and it's committed by one who recklessly causes the death of another human being. Before you may find the defendant guilty of second-degree reckless homicide, the [State] must prove by evidence which satisfies you beyond a reasonable doubt that the following two elements were present.
First, the defendant caused the death of Madeline Kara Neumann. "Cause" means that the defendant's conduct was a substantial factor in producing the death. Conduct can be either by an act or an omission when the defendant has a duty to act.

One such duty is the duty of a parent to protect their children, to care for them in sickness and in [health], and to do whatever is necessary for their preservation, including medical attendance, if necessary.

(Emphasis added.) The emphasized language was added by the circuit court to the standard jury instruction.
¶ 220. The instructions in Dale Neumann's case changed the explanation of duty: "One such duty is the duty of a parent to protect their children, to care for them in sickness and in health."
¶ 221. There is obviously a distinction between the two instructions. Dale's instructions do not use the word "medical" at all. Neither instruction uses the phrase "provide medical care when necessary." See majority op., ¶¶ 100, 104. Neither instruction refers to a "known legal duty." There was imprecision in the circuit court's instructions because these cases were breaking new ground.
¶ 222. An unresolved question is whether the prayer treatment immunity provision in Wis. Stat. § 948.03(6) modifies a parent's "duty" to provide medical care and, if so, when and how.
*548 ¶ 223. The duty question would have been answered in a prosecution under the child neglect statute. But here, in prosecutions for second-degree reckless homicide under Wis. Stat. § 940.06, the court had to make up an answer, suggesting that a "legal duty" was not clear. See Majority op., ¶¶ 109, 111. This underscores the inadequate notice provided to the Neumanns.
IV
¶ 224. There are several aspects of the Neumann trials that are problematic.
A. Jury Instructions
¶ 225. As noted above, the jury instructions with respect to "duty" are not consistent and may not provide a clear, accurate statement of parental duty.
¶ 226. The standard jury instruction for second-degree reckless homicide reads in part: "If you are satisfied beyond a reasonable doubt that the defendant caused the death of (name of victim) by criminally reckless conduct, you should find the defendant guilty of second degree reckless homicide. If you are not so satisfied, you must find the defendant not guilty." Wis JI — Criminal 1060.
¶ 227. The circuit court followed the instruction closely in Dale Neumann's case. In Leilani Neumann's case, however, the key paragraph is substantially rewritten to read:
If you are satisfied beyond a reasonable doubt that the defendant directly committed all of the two elements of second-degree reckless homicide or that the *549 defendant intentionally aided and abetted the commission of that crime, you should find the defendant guilty. If you are not so satisfied, then you must find the defendant not guilty.
¶ 228. The revised paragraph's reference to intentionally aiding and abetting "the commission of that crime," combined with the deletion of the phrase "caused the death of [name of victim]" muddles an already confusing legal analysis.
¶ 229. The jury instructions make no reference to the religious motivation of the defendants. It may be true that the defendants were not entitled to rely — in the jury instructions — on the treatment-through-prayer provision in Wis. Stat. § 948.03(6). However, the sole reference to religion in the jury instructions — "The Constitutional Freedom of Religion is absolute as to beliefs but not as to conduct which may be regulated for the protection of society" — can only be viewed as a repudiation of the defendants' position and a legal ruling that any "duty" imposed upon parents to provide medical care for their children is the same for prayer-treating parents as it is for other parents.
B. Decisions on Dale's Jury
¶ 230. Prior to voir dire in Dale Neumann's case, counsel for the defendant and the State met in Judge Vincent Howard's chambers and had an off-the-record discussion about how a jury's knowledge of Leilani Neumann's prior conviction for the same crime would be treated. Dale Neumann's counsel claimed that he objected to allowing any jurors with knowledge of the prior conviction to be on the panel, reasoning that "knowledge of the prior conviction would have to influence" a juror's decision in Dale Neumann's case.
*550 ¶ 231. Again, there is no record of this in-chambers discussion, and thus no record of counsel's objection to jurors with prior knowledge of Leilani Neumann's conviction. In his written decision on Dale and Leilani Neumann's joint post-conviction motion, Judge Howard acknowledged that he probably "remarked off the record that prior knowledge alone does not necessarily disqualify a juror." Faced with what appeared to be a ruling from the judge and the possibility that some jurors had knowledge of Leilani Neumann's conviction while some did not, Dale Neumann's counsel and the State agreed that all jurors should be informed of the wife's conviction rather than risk this fact being revealed during deliberations.
¶ 232. It is troubling that Dale Neumann's jury was informed of Leilani Neumann's conviction, especially since the underlying facts were the same, the law was the same, and the parents appear to have made their decisions jointly in the last 24 hours of Kara's life. It is hard to believe that a reasonable person in a juror's position at Dale Neumann's trial could have avoided being influenced by the result in Leilani Neumann's trial. Cf. State v. Faucher, 227 Wis. 2d 700, 718-19, 596 N.W.2d 770 (1999).
¶ 233. Another concern arising out of the absence of a transcript of the in-chambers meeting is that we do not know whether Dale Neumann was present at that meeting. If he was not present, he did not hear vital discussion about potential jurors having knowledge about Leilani's prior conviction. That discussion could have affected his strategy and decision and might have changed the result of his trial.
*551 V
¶ 234. This case is a tragedy in virtually every respect. I cannot say that the result of the Neumann trials is unjust. Nonetheless, there were and are serious deficiencies in the law and they ought to be addressed by the legislature and the courts. Failing to acknowledge these deficiencies will not advance the long-term administration of justice.
¶ 235. For the foregoing reasons, I respectfully dissent.

 See also Wis. Stat. § 948.03(3)(c) ("Whoever recklessly causes bodily harm to a child by conduct which creates a high *541 probability of great bodily harm is guilty of a Class H felony.").

 The American Heritage Dictionary of the English Language 1788 (3d ed. 1992).