COURT OF APPEALS
DECISION
DATED AND FILED

March 14, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1907-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF2730

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MICHAEL MOORE,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: JOSEPH R. WALL, Judge. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Michael Moore appeals from a judgment of conviction for neglecting a child resulting in death, contrary to WIS. STAT. § 948.21(2) (2021-22).[1] On appeal, he argues that he was not a person responsible for the child's welfare within the meaning of WIS. STAT. § 948.01(3) because he was not legally responsible for the child, he was not home at the time of the accident, and the child was instead at home with his mother at the time of the accident.

¶2 We disagree, and we conclude that Moore was indeed a person responsible for the child's welfare because of the parental role he played in the child's life. We further conclude that it is immaterial that Moore was not home at the time of the accident because Moore created the dangerous condition—leaving a loaded gun within the reach of a child—that led to the child's death. Therefore, we affirm.

## BACKGROUND

¶3 Following the death of five-year old Nathan[2] from a self-inflicted gunshot wound, the State charged Moore with one count of neglecting a child resulting in death, contrary to WIS. STAT. § 948.21(2). As alleged in the criminal complaint, Moore left a loaded gun on a shelf in the home that he shared with Nathan's mother, Nathan, and three younger children that Moore had with Nathan's mother. On the day of the accident, Moore was at work, and Nathan was

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] We refer to the child victim in this case using a pseudonym. *See* WIS. STAT. RULE 809.86.

2

home with his mother and three younger siblings. Nathan's mother put the children down for a nap, and she also fell asleep. She awoke to a "pop" sound and found Nathan unresponsive in the living room. Despite life saving measures performed by first responders, Nathan was pronounced dead as a result of a gunshot wound to his head.

¶4 Prior to trial, Moore moved to dismiss the criminal complaint on the grounds that he was not a person responsible for the child's welfare within the meaning of WIS. STAT. § 948.01(3). The trial court denied Moore's motion stating:

> [T]he motion is not timely so it is denied on that. More substantively, I don't think that the fact that the defendant was at work when this tragedy occurred is all that substantial. He created a situation by failing to do something that resulted in the death of this child.

The trial court also stated that the reasonable inferences from the facts provided in the criminal complaint support a finding that Moore was indeed a person responsible for the child's welfare, including that Moore was living with Nathan and his mother, Moore had three children with Nathan's mother, and Moore was "doing some things that a parent would do."

¶5 The case proceeded to a jury trial. Several witnesses testified at the trial, including Nathan's mother. In her testimony, Nathan's mother stated that she met Moore in April 2016, when Nathan was about three years old, and the couple began living together in May 2016, after she found out she was pregnant with the couple's first child. Since that time, the couple had two other children—a

set of twins—and they were living together as a family. In fact, she testified that she and Moore were in the process of buying a house together.[3]

¶6      She further testified that Nathan called Moore "Daddy Mikey," and she stated that Moore acted "like a father" to Nathan. In describing the relationship between Moore and Nathan, Nathan's mother testified that Moore would do things like take Nathan for haircuts, discipline Nathan when needed, help teach Nathan to tie his shoes, and drop him off at school. Overall, she testified that Moore "was a person that [she] relied on to help with the parenting," and she relied on Moore to fulfill "a father like role" in Nathan's life.

¶7      As to the events leading up to Nathan's death, Nathan's mother testified that she came home from work just after midnight, checked on the children, who were all asleep in their beds, and then checked in with Moore. After she checked in with Moore, Moore took the dog for a walk, and she went to bed. The next morning, Moore left for work, and she stayed home with the four children. She remembered Nathan waking her up because he was hungry, and she made breakfast for everyone. Later that morning, she put the children down for naps, and she saw Nathan take a blanket and lay down on the big couch in the living room. She stayed in her bedroom with the three younger children, but she could still see Nathan on the couch from the bed in her room. When she woke up, she thought she heard an "electrical pop," and she went to check on Nathan. She checked Nathan's bedroom and then the big couch in the living room where Nathan had been napping; she ultimately found Nathan unresponsive on the little

---

[3] As Moore repeatedly describes in his brief, they "had been building their family together."

4

couch in the living room. As described at trial, Nathan had climbed on the little couch in the living room, reached up to a shelf above the couch where Moore had put his gun the night before, and shot himself in the head.

¶8 In addition to witness testimony, the jury also watched portions of the interview Moore had with police. In that interview, Moore described to police that he took the dog for a walk the night before the accident and he took his gun with him.[4] He further stated that he returned home and put the gun on the shelf above the little couch—he did not put the gun away in the case or use the gun lock.[5]

¶9 At the close of the State's case, Moore moved for a directed verdict, again raising the argument that he was not a person responsible for Nathan's welfare within the meaning of WIS. STAT. § 948.01(3). The trial court found that the testimony provided by Nathan's mother was sufficient to establish that Moore played a parental role in Nathan's life and once more denied Moore's motion.

¶10 The jury found Moore guilty as charged, and Moore was subsequently sentenced to three years of initial confinement and four years of extended supervision, which was imposed and stayed for two years and six months of probation.

¶11 Moore now appeals.

---

[4] As described in the criminal complaint and throughout trial, Moore often carried a gun with him for protection.

[5] As established at trial, the shelf above the couch was approximately six feet off the ground. However, due to its location above the couch, a child of Nathan's height could have climbed onto the back of the couch and reached the shelf.

## DISCUSSION

¶12     On appeal, Moore raises the same argument that he was not a person responsible for the child's welfare within the meaning of WIS. STAT. § 948.01(3). In particular, Moore argues that he was not legally responsible for Nathan's care, he was not home at the time of the accident, and Nathan was in his mother's care. Therefore, he argues that he was not a person responsible for Nathan's welfare within the meaning of the statute. We disagree, and we conclude that Moore did in fact qualify as a person responsible for the child's welfare within the meaning of § 948.01(3).

¶13     As a threshold matter, the State argues that Moore forfeited his argument because it was originally raised in an untimely pretrial motion to dismiss the criminal complaint. *See* WIS. STAT. § 971.31(5)(c) (requiring a motion based on the sufficiency of the criminal complaint to be brought prior to the preliminary hearing). We agree with the State that Moore's pretrial motion was untimely; however, because Moore also raised this same argument in a timely motion for a directed verdict at the close of the State's case, and thus, we need not consider the State's argument for forfeiture further. Accordingly, we reject the State's argument, and we turn to the merits of Moore's argument.

¶14     As relevant here, the statute under which Moore was charged, WIS. STAT. § 948.21(2), provides:

> Any person who is responsible for a child's welfare who, through his or her action or failure to take action, for reasons other than poverty, negligently fails to provide any of the following, so as to seriously endanger the physical, mental, or emotional health of the child, is guilty of neglect ….

6

A person responsible for the child's welfare is then defined in WIS. STAT. § 948.01(3) as:

> the child's parent; stepparent; guardian; foster parent; an employee of a public or private residential home, institution, or agency; other person legally responsible for the child's welfare in a residential setting; or a person employed by one legally responsible for the child's welfare to exercise temporary control or care for the child.

¶15 Moore contends that, under the definition provided in WIS. STAT. § 948.01(3), he is not a person "who is responsible for a child's welfare." He argues that he clearly does not fall into any of the first six categories, and he focuses his argument on the seventh category—"a person employed by one legally responsible for the child's welfare to exercise temporary control or care for the child." *See* § 948.01(3). In making this argument, Moore emphasizes that he was not present at the time of the accident, and he contends that Nathan's mother was instead responsible for Nathan's care at the time of the accident. Therefore, he contends he was not employed by one legally responsible for Nathan's welfare at the time of the accident, and any exercise of temporary control or care for the child ended when Nathan's mother returned home from work. We disagree.

¶16 "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). We give statutory language "its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." ***Id.*** "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." ***Id.***, ¶44. We review issues of

statutory interpretation independently.  *See State v. Arberry*, 2018 WI 7, ¶14, 379 Wis. 2d 254, 905 N.W.2d 832.

¶17    In addressing a prior situation involving a live-in boyfriend and the interpretation of WIS. STAT. § 948.01(3), our supreme court concluded, "[A] live-in boyfriend can be a 'person … responsible for the welfare of [a] child,' if he was used by the legal guardian of the child as a caretaker for the child."  *State v. Sostre*, 198 Wis. 2d 409, 411, 414-15, 542 N.W.2d 774 (1996) (alteration in original; citation omitted).  In that case, the mother testified that she had been living with the defendant for about three years, and "the defendant did everything that she did with regard to taking care of the children, including feeding and bathing them."  *Id.* at 412.  The mother said that her son "considered the defendant his father or stepfather, called him 'Poppy,' and … had a normal father-son relationship with the defendant."  *Id.*  Thus, our supreme court reached the conclusion that

> [u]nder these facts, it seems clear that the mother made use of the services of the defendant, or engaged the services of the defendant, in order to take care of her child when it was necessary for her to be away.  In other words, the defendant was clearly "employed" by a person "legally responsible" for a child to "care for that child."

*Id.* at 415.

¶18    The facts in this case are similar, and under *Sostre*, Moore clearly qualifies as a live-in boyfriend who was regularly used by Nathan's mother as a caretaker.  He, thus, falls into the seventh category as "a person employed by one legally responsible for the child's welfare to exercise temporary control or care for the child."  *See* WIS. STAT. § 948.01(3).  As established through the testimony of Nathan's mother, Moore had been living with Nathan and his mother since Nathan

8

was about three years old, Nathan's mother relied on Moore to fill a father-like role in Nathan's life, and Nathan called Moore "Daddy Mikey." Moore also acted as a parent by disciplining Nathan, taking him for haircuts, and teaching Nathan to tie his shoes. Thus, we conclude that Moore was indeed a person responsible for Nathan's welfare as one who was "employed by one legally responsible for the child's welfare to exercise temporary control or care for the child." *See* § 948.01(3).

¶19 We further conclude that it is immaterial that Moore was at work instead of at home at the time of the accident or that Nathan's mother was home with the children at the time of the accident. Moore created the condition that led to Nathan's death when he left his loaded gun on a shelf in the living room and within Nathan's reach. In reaching this conclusion, we give effect to the legislature's recognized intent "to broadly define the category of persons responsible for a child's welfare." *See **State v. Evans***, 171 Wis. 2d 471, 480, 492 N.W.2d 141 (1992). In fact, "[t]he legislature determined that it was especially concerned about abuse by people who children, by necessity, must rely upon for their physical well-being." *See **Sostre***, 198 Wis. 2d at 417. Thus, the legislature "use[d] the verb 'includes,' which is normally a term of enlargement rather than limitation," when it defined the category of persons responsible for a child's welfare. *See **Evans***, 171 Wis. 2d at 480. Taking a narrow view of the statute in this case, specifically by requiring Moore's presence in the home at the time of the accident when he fulfilled a father-like role in Nathan's life and was the one who created the dangerous condition that led to Nathan's death, would be contrary to the legislature's intent recognized in ***Sostre*** and ***Evans***.

¶20 In sum, we conclude that the facts of this case are sufficient to establish that Moore was a person "who is responsible for the child's welfare" within the meaning of WIS. STAT. § 948.01(3). Consequently, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.